THE STATE OF OHIO, APPELLEE, *v*. MAXWELL, APPELLANT.

[Cite as *State v. Maxwell,* 139 Ohio St.3d 12, 2014-Ohio-1019.]

*Criminal law—Right to confront witnesses—Sixth Amendment—Autopsy reports and testimony by nonexamining deputy coroner—Aggravated murder— Death penalty upheld.*

(No. 2007-0755—Submitted June 5, 2013—Decided March 20, 2014.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. 475400.

————————————

SYLLABUS OF THE COURT

An autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

————————————

LANZINGER, J.

{¶ 1} This is an appeal as of right by defendant-appellant, Charles Maxwell, who has been sentenced to death for the aggravated murder of Nichole McCorkle.

**I. Trial Evidence**

{¶ 2} Evidence introduced at trial showed that McCorkle and Maxwell had a long-term relationship that began in 1999, living together on different occasions over the next few years. They had one child, C.M., nearly four years old. Nichole also had two other children, D.C. and D.K. In August 2005, she purchased a single-family home at 1046 East 146th Street in Cleveland and lived

there with her father and two of the children. Maxwell had a key to the side door of the house and kept some clothes there.

*The underlying assault*

{¶ 3} The prosecution introduced evidence showing that on October 6, 2005, Nichole went to the hospital and received stitches for head injuries after Maxwell struck her. Police came to the hospital and took Nichole's report about the incident. On the same date, Maxwell told John Gregg, a friend and coworker, that he had pistol-whipped Nichole. On October 13, 2005, she obtained a temporary protection order against Maxwell.

{¶ 4} Afterward, prosecutors presented felonious-assault charges against Maxwell to the grand jury. Nichole was subpoenaed to testify before it on November 23, 2005.

{¶ 5} Maxwell told Gregg that he was concerned about receiving prison time for felonious assault. Maxwell knew about the temporary protection order and that a warrant had been issued for his arrest. He had also learned that Nichole was going to testify against him at the grand jury.

{¶ 6} At Maxwell's behest, Gregg contacted Nichole about her grand jury testimony in an effort to reduce the charges from felonious assault to a lesser offense. Gregg asked Nichole to "stick to the story that it was a simple domestic; she pushed him, he pushed her, she slipped and hit her head on the stove."

*A. Nichole's grand jury testimony*

{¶ 7} Following Nichole's testimony on November 23, 2005, the grand jury indicted Maxwell for felonious assault, abduction, and domestic violence. Brian Mooney, an assistant prosecutor for Cuyahoga County, informed Nichole that day that the grand jury had voted to indict and told her what the charges were. Because of the Thanksgiving holiday, the indictment was not signed by the grand jury foreman and filed with the clerk of court until November 28, 2005.

2

**{¶ 8}** The evening of the grand jury's decision, Maxwell called Gregg and said that he had been trying to talk to Nichole about her grand jury testimony but had been unable to contact her. Maxwell then called Nichole while Gregg remained on the line and heard their conversation. Maxwell asked Nichole what happened in court that day. Nichole told him, "I told the truth. I had to tell the truth." According to Gregg, Maxwell was very upset after the phone call and said that "the bitch was going to make him kill her." Maxwell also asked Gregg where he could get a gun.

*B. The events of November 26 and 27, 2005*

**{¶ 9}** The prosecution presented evidence that on the evening of November 26, 2005, Nichole and Willie Hutchinson met at a bar. Lauretta Kenney, Nichole's sister, had introduced Hutchinson to Nichole after the October 6 incident. Nichole and Hutchinson arrived at the bar in separate cars and had a few drinks. When they departed, although Nichole had told Hutchinson that she would call him when she got home, she did not. But Hutchinson called Nichole, and a man answered the phone. Hutchinson then called Lauretta and told her to check on Nichole.

**{¶ 10}** Near 2:30 a.m. on November 27, Lauretta called Nichole, and Maxwell answered the phone. Maxwell immediately gave the phone to Nichole. Lauretta asked Nichole why Maxwell was there and told her that he needed to leave. According to Lauretta, Nichole said that "she was confused and she didn't know what was going on."

**{¶ 11}** Lauretta then drove to Nichole's home and arrived around 2:40 a.m. but did not see Maxwell's car on the street or in the driveway. Lauretta called Nichole, saying she was outside. Nichole "mumbled something" and then hung up. Lauretta went onto the porch, and Nichole and Maxwell were standing next to each other when Lauretta opened the screen door.

{¶ 12} Lauretta told Maxwell that he was not supposed to be there and needed to leave. Maxwell said that he was just talking to Nichole. Lauretta testified, "I told him, there's no talking, that you needed to leave." He then called Lauretta "a bitch" and said, "[I]f anybody's leaving it's going to be you." Maxwell then stepped back and pulled a gun from his pants. Nichole screamed, "[O]h my God, Lauretta, he got a gun, run." Lauretta then jumped off the porch and started running. Lauretta heard two gunshots as she ran across the street and heard a third gunshot after she crossed the street. Lauretta then saw Maxwell kneeling down by Nichole.

{¶ 13} C.M., a day short of four years old, was standing near Maxwell and Nichole when Lauretta came to the door. Later, when asked what she had seen, C.M. testified, "He shoot my mommy."

{¶ 14} Maxwell ran from the house after shooting Nichole and fled down the street. Lauretta followed him for a short distance before he disappeared. Shortly afterwards, police officers and emergency medical personnel arrived on the scene. Nichole was taken to the hospital, where she died from her injuries.

{¶ 15} On the morning of November 27, Michelle Kenney, Nichole's other sister, called Gregg and told him that Maxwell had killed Nichole. Gregg said that he then called Maxwell and asked him if he had killed Nichole. Maxwell admitted killing her and recounted what happened. He said he had followed Nichole from her home to the bar. She went into the bar, and Maxwell waited outside in his car. He then went inside and saw Nichole and another man sitting in the back of the bar "making out." Maxwell then returned to his car and waited. After they left the bar, he followed Nichole and the man as they drove in separate cars to Nichole's house. Nichole kissed the man and went into her house, and the man drove away.

{¶ 16} Gregg also testified that Maxwell told him that he called Nichole after the other man drove away and asked if he could come over. Nichole said he

4

could, and Maxwell went to her house. Maxwell answered the phone at Nichole's house, including repeated calls from a man who asked to speak to Nichole. He also answered a call from Lauretta. Maxwell told Gregg that "they started arguing and then he confronted her about that night." Lauretta then came to the front door, and Maxwell "opened the door[,] pointed the gun and fired but she had ran." Then, Maxwell told Gregg, "he just turned around, shot Nichole and she fell down and * * * she moved and then he shot her again."

### C. The Police Investigation

{¶ 17} Police investigators found two .25 caliber shell casings inside the house. Investigators looked inside and outside the house for a third shell casing, which they never found. Investigators also did not find any bullet holes inside or outside the house.

{¶ 18} Dr. David Dolinak, a medical examiner with the Cuyahoga County coroner's office, conducted Nichole's autopsy. Nichole suffered two gunshot wounds to the head. One gunshot in the middle of the right eyebrow broke the bones of the eye socket. The bullet did not enter the brain but lodged in the sinuses on the right side of the nose. The other gunshot went through the left side of the head into the right side of the brain. Dr. Dolinak concluded that Nichole died from gunshot wounds to the head and that the death was a homicide.

{¶ 19} Detective James Ealey, a firearms examiner with the Cleveland Police Department, examined the two bullets recovered during the autopsy. Ealey testified that they had been fired from the same weapon. His written report stated that the bullets were "consistent with 25 auto type ammunition."

{¶ 20} The police sought to locate and arrest Maxwell following Nichole's death. On December 16, 2005, FBI Special Agent Robert Riddlebarger and other members of the Cleveland/Cuyahoga County Fugitive/Gang Task Force went to a Cleveland home to arrest him. After entering the home, they found Maxwell hiding in a crawl space behind a bed in a second-floor bedroom. As he was being

handcuffed, Maxwell was asked whether he was armed or whether there were any weapons nearby. He replied, "I do not have a gun anymore." A few seconds later, Maxwell blurted out that he had gotten rid of the gun that he had.

{¶ 21} The defense presented no witnesses during the guilt phase of the trial.

## II. Case History

{¶ 22} Maxwell was indicted on two counts of aggravated murder. Count One charged him with the aggravated murder of Nichole with prior calculation and design. Count Two charged him with the aggravated murder of Nichole while committing kidnapping and/or aggravated burglary. Both counts contained death-penalty specifications for a course of conduct involving multiple murders or attempted murders, R.C. 2929.04(A)(5), murder while committing kidnapping or aggravated burglary, R.C. 2929.04(A)(7), murder in retaliation for testimony in a criminal proceeding, R.C. 2929.04(A)(8), and murder to escape accounting for a crime, R.C. 2929.04(A)(3).

{¶ 23} Maxwell was also charged with six additional counts: Count Three—kidnapping, Counts Four and Five—aggravated burglary, Count Six—the attempted murder of Lauretta Kenney, Count Seven—retaliation against Nichole because she filed criminal charges against him, and Count Eight—having a weapon while under disability. Counts One through Seven each contained a firearm specification.

{¶ 24} Maxwell pled not guilty to all charges and specifications. The matter proceeded to a jury trial on the first seven counts, while Maxwell waived a jury trial on Count Eight. At the close of the state's case, defense counsel filed a Crim.R. 29 motion to dismiss the charges. The trial court granted the motion to dismiss Counts Two through Five and the felony-murder death-penalty specification but denied the motion to dismiss the other charges. The jury found Maxwell guilty of Counts One and Seven, the retaliation and murder-to-escape-

accounting specifications, and two firearm specifications. He was found not guilty of Count Six and the course-of-conduct specification. Separately, the trial court found Maxwell guilty of having a weapon while under a disability.

{¶ 25} Prior to sentencing, the R.C. 2929.04(A)(3) specification was merged into the R.C. 2929.04(A)(8) specification. Following the presentation of evidence in the penalty phase of the trial, the jury recommended that Maxwell be sentenced to death. The trial court accepted the jury's recommendation, and Maxwell was sentenced to death on Count One. He was also sentenced to five years in prison for the independent count of retaliation, three years on the firearm specification, and five years for having a weapon under a disability.

### III. Issues on Appeal

{¶ 26} The principal issues for review include the adequacy of trial counsel's preparation and presentation of mitigating evidence, the trial court's failure to appoint a neurologist, the admissibility of Maxwell's statements to police at the time of his arrest, and the admissibility of the medical examiner's testimony and the autopsy report under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

{¶ 27} In this appeal, Maxwell raises 19 propositions of law. We will address the issues in the approximate order that they arose during the trial; however, we will first discuss proposition of law XV, which deals with the admissibility of the medical examiner's testimony and the autopsy report, as those issues present novel questions of law.

### Proposition of Law XV

{¶ 28} In proposition of law XV, Maxwell argues that the trial court erred by admitting the autopsy report on Nichole McCorkle and by allowing Dr. Felo, who did not conduct the autopsy, to testify about the autopsy results in violation of his Sixth Amendment right to confrontation and *Crawford*.

{¶ 29} Dr. David Dolinak conducted Nichole's autopsy on November 28, 2005. The prosecution called Dr. Joseph Felo to testify about the autopsy instead of Dr. Dolinak, who at the time of trial had become the medical examiner for Austin, Texas. Maxwell objected to Dr. Felo's testimony, citing *Crawford* and the best-evidence rule. The trial court cited *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, and allowed Dr. Felo to substitute as a witness. Dr. Dolinak's autopsy report was also admitted into evidence over defense objection.

{¶ 30} Dr. Felo testified that he had reviewed the autopsy report and the autopsy photographs and x-rays of the victim and looked at tissue slides under the microscope. He discussed the external examination of Nichole that was conducted during the autopsy. He testified that there were two gunshot wounds to the head and a bruise in the midportion of the chest. He referred to the autopsy report in stating that this injury "was interpreted to be because of medical therapy, CPR, doing chest compressions." He testified that the internal examination of the skull revealed a tear going through the right eyeball and into the brain. There was also some bleeding and bruising caused by bullets going through the brain.

{¶ 31} Dr. Felo referred directly to the autopsy report in discussing the victim's wounds. He testified, "Gunshot wound number one *is described* as being in the right eyebrow" (emphasis added), and he referred to the autopsy report in describing the trajectory of the gunshot. He also testified that the bullet from the other gunshot traveled "through the scalp and through the brain and skull from the left side going towards her right side." He used autopsy photographs to illustrate this testimony.

{¶ 32} Dr. Felo testified that microscopic examination showed the tears and bleeding caused by the bullets going through the brain, that microscopic evaluation of swabs taken from the victim's mouth, vagina, and rectum revealed no evidence of sperm, and that stippling was found around both entrance wounds.

He expressed his opinion that stippling is generally found when "it's within 18 inches of the end of the muzzle to the target."

{¶ 33} Although Dr. Felo testified that the Cuyahoga County coroner had established the cause and manner of death, he also provided his own opinion, stating, "The cause of Nichole Anna Maria McCorkle's death is gunshot wounds of [the] head * * *. The manner of death is a homicide."

## DISCUSSION

{¶ 34} The Sixth Amendment's Confrontation Clause provides, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."   The United States Supreme Court has interpreted this to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177.

{¶ 35} *Crawford* did not define the word "testimonial" but stated generally that the core class of statements implicated by the Confrontation Clause includes statements " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "   *Id.* at 52, quoting the amicus brief of the National Association of Criminal Defense Lawyers.  The Crawford opinion announced a "fundamentally new interpretation of the confrontation right."  *Williams v. Illinois,* ___ U.S. __, 132 S.Ct. 2221, 2232, 183 L.Ed.2d 89 (2012).

{¶ 36} We have already considered the distinction between testimonial and nontestimonial statements.  In *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88, we held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6).  We held that there was no Sixth Amendment

violation in admitting the autopsy report because *Crawford* had indicated that "business records are, 'by their nature,' not testimonial" and were therefore admissible. *Id*. at ¶ 81, quoting *Crawford*, 541 U.S. at 56. We stated, "An autopsy report, prepared by a medical examiner and documenting objective findings, is the 'quintessential business record.' " *Id*. at ¶ 82, quoting *Rollins v. State*, 161 Md.App. 34, 81, 866 A.2d 926 (2005).

{¶ 37} After our decision in *Craig*, the United States Supreme Court decided that analysts who had performed laboratory tests were required to testify. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009). While the dissent states that the reasoning in *Craig* has been undone by *Melendez-Diaz*, we do not agree. In *Melendez-Diaz,* the court held that three notarized certificates of analysis showing that a forensic analysis identified cocaine were inadmissible. Being "quite plainly affidavits," they constituted testimonial statements because they were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.' " *Id*. at 310-311, quoting *Davis v. Washington*, 547 U.S. 813, 830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The affidavits were also " ' "made under circumstances which would lead an objective witness reasonably to believe that the statement[s] would be available for use at a later trial." ' " *Id*. at 311, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177, quoting the amicus brief of the National Association of Criminal Defense Lawyers. Thus, the analysts who had provided the affidavits were witnesses for Confrontation Clause purposes, and the defendant had the right to confront them. *Id*. at 311.

{¶ 38} Shortly afterwards, we considered how foundational testimony is to be presented for DNA analysis. *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745. In *Crager*, a DNA expert from the Bureau of Criminal Identification and Investigation ("BCI") had testified about a DNA analysis performed by another agent. *Id.* at ¶ 8. We held that the DNA report was a

nontestimonial business record and that its introduction without the testimony of the BCI agent who prepared it did not violate *Crawford*. *Id*. at ¶ 78-79. Relying upon our earlier opinion, we stated, "The autopsy report at issue in *Craig* is not distinguishable from the DNA reports in this case." *Id*. at ¶ 51. "As in *Craig*, the scientific-test reports in this case were prepared in the ordinary course of regularly conducted business and so were not testimonial." *Id*. at ¶ 54. The United States Supreme Court vacated the judgment in *Crager* and remanded the case for further consideration in light of *Melendez-Diaz*. *Crager v. Ohio*, 557 U.S 930, 129 S.Ct. 2856, 174 L.Ed.2d 598 (2009). Thereafter, without deciding whether Crager's right to confront witnesses had been denied, we "vacat[ed] the judgment of the trial court and remand[ed] the cause to the trial court for a new trial consistent with *Melendez-Diaz v. Massachusetts*." *State v. Crager*, 123 Ohio St.3d 1210, 2009-Ohio-4760, 914 N.E.2d 1055, ¶ 3.

{¶ 39} Next, the Supreme Court decided *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011). In *Bullcoming*, instead of calling the analyst who signed and certified the forensic report for blood-alcohol concentration in a DWI case, the prosecution introduced the lab report through the testimony of another analyst who had not performed or observed the analysis but was familiar with the testing procedures of the laboratory. Although the witness was a "knowledgeable representative of the laboratory" who could "explain the lab's processes and the details of the report," *id*. at 2723 (Kennedy, J, dissenting), the majority held that the surrogate witness was not a proper substitute for the analyst who had conducted the test. The court concluded, "The accused's right is to be confronted with the analyst who made the certification * * *." *Id*. at 2710.

{¶ 40} *Bullcoming* also held that the blood-alcohol analysis reports were testimonial. The court stated, "In all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*. Here, as in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law

to assist in police investigations. * * * Like the analysts in *Melendez-Diaz*, [the certifying analyst] tested the evidence and prepared a certificate concerning the result of his analysis." *Id*. at 2717. Thus, while the *Crawford* court declined to define "testimonial," later decisions seem to explain the meaning of the word by stating that testimonial statements are those made for "a primary purpose of creating an out-of-court substitute for trial testimony." *Michigan v. Bryant,* ___ U.S. __, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011); *see also Bullcoming* at 2714, fn. 6, quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 ("To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution' "). If a statement's primary purpose is anything else, the statement is nontestimonial. Its admissibility is "the concern of state and federal rules of evidence, not the Confrontation Clause." *Id*.

{¶ 41} Most recently, five justices held that expert testimony from a forensic specialist did not violate a defendant's right to confrontation. *Williams v. Illinois*, __ U.S. __, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). The expert witness testified that a DNA profile produced by an outside laboratory (Cellmark) from a rape victim's vaginal swabs matched the defendant's DNA profile produced by a state police lab from the defendant's blood sample. *Id*. at 2229-2230. The Cellmark report itself was neither admitted into evidence nor shown to the fact-finder. The expert witness also did not quote or read from the report or identify the report as the source of any of her opinions. *Id*. at 2230.

{¶ 42} Four of the five justices reasoned that the statements in the Cellmark report were nontestimonial because, first, the out-of-court statements were related by the expert solely for the purpose of explaining the assumptions on which the expert's opinion relied and were not offered for their truth. *Id*. at 2240-2241. And second, even if the Cellmark report had been admitted into evidence, it was not a testimonial document, because it was not prepared for "the primary

12

purpose of accusing a targeted individual," which distinguished this report from the forensic reports in *Melendez-Diaz* and *Bullcoming*. *Id*. at 2242. Justice Thomas agreed that the expert's testimony did not violate the Confrontation Clause, but only because the Cellmark report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." *Id*. at 2255 (Thomas, J., concurring in judgment), quoting *Michigan v. Bryant* at 1167 (Thomas, J., concurring in judgment).

{¶ 43} The admission of the autopsy report and Dr. Felo's testimony must now be considered in light of the foregoing cases.

*Maxwell's arguments*

{¶ 44} Maxwell argues that *Bullcoming* prohibited Dr. Felo's surrogate testimony about Nichole's autopsy even though he was a "knowledgeable representative" who could explain the lab's processes and the details of the autopsy report. Maxwell emphasizes that Dr. Felo's testimony was introduced to prove a key fact at trial and was offered for the truth of the hearsay. Thus, Maxwell argues that he was entitled to confront and cross-examine the medical examiner who actually performed Nichole's autopsy and wrote the report.

{¶ 45} Maxwell argues that *Williams,* a decision resulting from a bench trial, should be distinguished from his case, which was tried before a jury without any limiting instructions regarding the purpose for which the report could be considered. He emphasizes that the *Williams* plurality indicated that the DNA testimony might not have been admissible if that defendant had elected to have a jury trial.

{¶ 46} Maxwell also argues that unlike the purpose in *Williams*, the primary purpose of the autopsy and the related report was to establish that Nichole's death resulted from a crime rather than an accident, suicide, or other means. Thus, Maxwell argues that Dr. Felo's testimony and the introduction of the autopsy report resulted in a Confrontation Clause violation because the

purpose was " ' "to establish or prove past events potentially relevant to later criminal prosecutions," ' " quoting *Williams,* 132 S.Ct. at 2251, 183 L.Ed.2d 89 (Breyer, J., concurring), quoting *Davis,* 547 U.S. at 822, 126 S.Ct. 2266, 165 L.Ed.2d 224.

*The state's arguments.*

{¶ 47} The state advances three main arguments for the admissibility of the autopsy report and the deputy coroner's testimony. First, the state argues that this court should continue to apply *Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 88, in which we held that an autopsy report completed by a nontestifying medical examiner was admissible as a nontestimonial business record under Evid.R. 803(6). Second, the state argues that the coroner has a duty to conduct autopsies and maintain reports and that this duty exists entirely independent of any potential criminal prosecution that might later occur. The state also asserts that autopsy reports are not created for the purpose of litigation, because they do not identify suspects and are not accusatory in nature. Third, the state also points out that the passage of time can easily lead to the unavailability of the medical examiner who conducted an autopsy and that requiring the medical examiner who conducted the autopsy to testify would be equivalent to placing a statute of limitations on murder prosecutions.

{¶ 48} Finally, even if admission of the autopsy report and Dr. Felo's testimony violated Maxwell's right to confrontation, the state argues that the error was harmless beyond a reasonable doubt.

*Analysis*

{¶ 49} A key element in evaluating the admissibility of the coroner's testimony and the autopsy report in light of the recent United States Supreme Court cases is the primary-purpose test, which examines the reasons for and purpose of the record in question. To determine the primary purpose, a court must "objectively evaluat[e] the statements and actions of the parties to the

encounter" giving rise to the statements. *Bryant,* 131 S.Ct. at 1162, 179 L.Ed.2d 93; *see also Williams,* 132 S.Ct. at 2243, 183 L.Ed.2d 89 (plurality opinion of Alito, J.).

*Coroner's testimony*

{¶ 50} Although Maxwell relies on *Bullcoming,* which disallowed surrogate testimony and held that the blood-alcohol reports admitted during the surrogate's testimony were testimonial, the majority of jurisdictions that have examined this issue have concluded that a substitute examiner, on direct examination, may at least testify as to his or her own expert opinions and conclusions regarding the autopsy and the victim's death. *E.g., Commonwealth v. Avila*, 454 Mass. 744, 762, 912 N.E.2d 1014 (2009) ("the expert witness's testimony must be confined to his or her own opinions and, as to these, the expert is available for cross-examination"); *Commonwealth v. Phim*, 462 Mass. 470, 479, 969 N.E.2d 663 (2012) (a substitute medical examiner may not testify on direct examination as to facts and conclusions stated in an autopsy report without personal knowledge or having independently reached the same conclusion); *State v. Joseph,* 230 Ariz. 296, 298, 283 P.3d 27 (2012) (as long as the substitute expert reaches his or her own conclusions, the Confrontation Clause is satisfied).

{¶ 51} The Supreme Court of California, however, expanded the scope of admissible opinion testimony by a substitute examiner. The court allowed the substitute medical examiner to testify regarding his "independent opinion" as an expert witness as to the cause of the victim's death, when that opinion was based solely on a review of the autopsy report. *People v. Dungo*, 55 Cal.4th 608, 618, 147 Cal.Rptr.3d 527, 286 P.3d 442 (2012). Because the expert witness did not describe the conclusions reached by the nontestifying examiner, and the expert's descriptions were limited to objective facts, such as the condition of the victim's body at the time of the autopsy, these types of statements were not testimonial in nature. *Id*. at 619.

**{¶ 52}** We agree. Maxwell's argument is also not persuasive because the *Williams* plurality stated that the forensic report (the Cellmark report) could have been admitted into evidence without violating the Confrontation Clause. *Williams,* 132 S.Ct. at 2242, 183 L.Ed.2d 89.

**{¶ 53}** Dr. Felo testified that he reached his own independent judgment on the cause and manner of Nichole's death based upon his analysis of the evidence in the autopsy report, which itself was admitted. His conclusions were the same as those in the report. But after reviewing the forensic evidence, Dr. Felo also provided some opinions that were not included in the autopsy report. For example, he provided his own conclusions about muzzle-to-target distance based on stippling around the entrance wounds on Nichole's head. Such testimony constituted Dr. Felo's original observations and opinions and did not violate the Confrontation Clause, because he was available for cross-examination regarding them.

*Autopsy report*

**{¶ 54}** In 2006, this court concluded that an autopsy report was a nontestimonial business record and that its admission did not impinge on a defendant's confrontation rights. *Craig,* 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81-88 (applying *Crawford v. Washington*). Although the United States Supreme Court has decided several confrontation cases since our decision, they do not require departure from our holding in *Craig.*

**{¶ 55}** Maxwell invokes the primary-purpose test that the *Williams* plurality discussed. The *Williams* plurality stated that the Cellmark report could have been admitted into evidence because it "was not prepared for the primary purpose of accusing a *targeted* individual" of engaging in criminal conduct. (Emphasis added.) *Williams*, 132 S.Ct. at 2243, 183 L.Ed.2d 89. In contrast, Maxwell argues that the primary purpose of the autopsy and the related report was to establish that Nichole's death was a crime. However, Maxwell fails to mention

that five justices in *Williams* rejected the plurality's narrowed definition of the primary-purpose test (the targeted-individual test). *Id*. at 2273 (Kagan, J., dissenting). Thus, Maxwell's reliance on the plurality's narrowed definition of the primary-purpose test is not helpful to our resolution of this issue.

**{¶ 56}** Meanwhile, the state urges us to continue to adhere to *Craig*'s holding that an autopsy report is admissible as a nontestimonial business record. But an otherwise inadmissible testimonial statement may not be admitted into evidence based upon the business-and-official-records hearsay exception. *Melendez-Diaz*, 557 U.S. at 324, 129 S.Ct. 2527, 174 L.Ed.2d 314. Although documents kept in the regular course of business are ordinarily admitted into evidence under the hearsay exception, they are inadmissible "if the regularly conducted business activity is the production of evidence for use at trial." *Id.* at 321. When a statement is " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' " it is considered testimonial. *Id*. at 311, quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354, 158 L.Ed.2d 177. Thus, labeling autopsy reports as "business records" does not end the inquiry.

**{¶ 57}** An analysis of the primary-purpose test bears out *Craig*'s conclusion that autopsy reports are nontestimonial. Autopsy reports are not intended to serve as an "out-of-court substitute for trial testimony." *Bryant,* 131 S.Ct. at 1155, 179 L.Ed.2d 93. Instead, they are created "for the primary purpose of documenting cause of death for public records and public health." Carolyn Zabrycki, Comment, *Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement,* 96 Cal.L.Rev. 1093, 1130 (2008); *see also People v. Leach,* 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570, ¶ 129 (a medical examiner is "charged with protecting the public health by determining the cause of a sudden death").

*Ohio statutes*

**{¶ 58}** Ohio coroners conduct autopsies pursuant to the authority granted to them by R.C. Chapter 313. Coroners must "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under [their] jurisdiction." R.C. 313.09. The death certificate also must indicate the "manner and mode in which the death occurred." R.C. 313.19. If the cause and manner of death are not apparent—as when someone "dies as a result of criminal or other violent means, by casualty, by suicide, or in any suspicious or unusual manner" or "when any person * * * dies suddenly when in apparent good health," R.C. 313.12—the coroner is notified so that an autopsy may be conducted. An autopsy is a "compelling public necessity" if it is needed to "protect[] against an immediate and substantial threat to the public health" or to assist law enforcement in conducting a murder investigation. R.C. 313.131.

**{¶ 59}** Although autopsy reports are sometimes relevant in criminal prosecutions, *Craig* rightly held that they are not created primarily for a prosecutorial purpose. Consistent with *Craig*, other courts have held that coroners are statutorily empowered to investigate unnatural deaths and authorized to perform autopsies in a number of situations, only one of which is when a death is potentially a homicide. *People v. Leach*, 405 Ill.App.3d 297, 308-309, 345 Ill.Dec. 694, 939 N.E.2d 537 (2010), *aff'd,* 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570; *Dungo*, 55 Cal.4th 608, 147 Cal.Rptr.3d 527, 286 P.3d 442 (testimony by a chief medical examiner who did not prepare the decedent's autopsy report was admissible); *United States v. James,* 712 F.3d 79, 97 (2d Cir.2013) (autopsy report was to be considered on whether it was "prepared with the primary purpose of creating a record for use at a later trial").

**{¶ 60}** Ohio courts of appeals have also continued to uphold the admissibility of autopsy reports prepared by nontestifying medical examiners since *Melendez-Diaz*. *State v. Hardin*, 193 Ohio App.3d 666, 2010-Ohio-6304,

18

953 N.E.2d 847, ¶ 9-20 (4th Dist.) (autopsy report prepared by nontestifying medical examiner admissible as a nontestimonial business record, since it was not prepared for purposes of litigation); *State v. Zimmerman*, 8th Dist. Cuyahoga No. 96210, 2011-Ohio-6156, ¶ 43-45 (admissibility of autopsy report prepared by nontestifying medical examiner does not conflict with *Bullcoming*); *State v. Adams,* 7th Dist. Mahoning No. 08 MA 246, 2012-Ohio-2719, ¶ 20, 26 (*Craig* still controls and autopsy report is nontestimonial evidence under *Crawford,* as it is not made solely at the behest of police in order to convict the particular defendant); *State v. Monroe,* 8th Dist. Cuyahoga No. 94768, 2011-Ohio-3045 (*Craig* not in conflict with *Melendez-Diaz*).

{¶ 61} As a final matter, the admissibility of autopsy reports completed by a nontestifying medical examiner presents unique policy interests that are not present in other *Crawford*-related evidentiary matters. A medical examiner who conducted an autopsy may be unavailable or deceased when a trial begins. And unlike other forensic tests, a second autopsy may not be possible due to cremation of the victim's body or other loss of evidence with passage of time.

{¶ 62} Under R.C. 313.09, coroners are required to "keep a complete record of and * * * fill in the cause of death on the death certificate, in all cases coming under [their] jurisdiction." Moreover, the scope of an examiner's duty is the same regardless of whether criminal activity is suspected or not. The Illinois Supreme Court has recognized that in some instances, police may compel the conducting of an autopsy during investigation of a cold case for later use at trial, and in that event the autopsy may play a testimonial role. *People v. Leach,* 2012 IL 111534, 366 Ill.Dec. 477, 980 N.E.2d 570, ¶ 133. The dissent rejects the primary-purpose test and would hold that whether a particular autopsy report is testimonial should be determined on a case-by-case basis. But generally, autopsy reports are neither (1) prepared for the primary purpose of accusing a targeted individual nor (2) prepared for the primary purpose of providing evidence in a

criminal trial. For Sixth Amendment purposes, it is only the *primary* purpose of a document that determines whether it is testimonial or not.

{¶ 63} *Melendez-Diaz* and *Bullcoming*, on which Maxwell relies, are readily distinguishable here. In both cases, the forensic reports were made at the request of police, for specific "evidentiary purposes" in order to aid in a police investigation. The record does not show that to be the case here. We hold that an autopsy report that is neither prepared for the primary purpose of accusing a targeted individual nor prepared for the primary purpose of providing evidence in a criminal trial is nontestimonial, and its admission into evidence at trial under Evid.R. 803(6) as a business record does not violate a defendant's Sixth Amendment confrontation rights.

{¶ 64} Finally, the state argues that any error in admitting Dr. Felo's testimony and the autopsy report constitutes harmless error beyond a reasonable doubt, an issue we must determine. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Even if there was error in admitting the coroner's testimony and the autopsy report, as discussed later in proposition XIII, overwhelming evidence was introduced that established Maxwell's guilt, and expert testimony was not crucial in proving the cause and manner of Nichole's death. Eyewitness testimony established that Maxwell shot Nichole in the head, and two .25-caliber shell casings were found inside the house after Maxwell fled the scene. Maxwell also admitted to Gregg that he shot Nichole twice. Finally, Michelle Kenney testified that Nichole died a short time after arriving at the hospital.

{¶ 65} We will now address the remaining issues in the approximate order that they arose during the trial proceedings.

*A. Pretrial and trial issues*

1. *Amendment of the indictment* (Proposition of law II)

{¶ 66} Maxwell argues that the trial court erred by allowing the prosecutor to amend the indictment without engaging in a colloquy with the defendant to ensure that he knowingly, intelligently, and voluntarily waived his right to a grand jury.

{¶ 67} At the beginning of trial, the prosecutor sought to amend pursuant to Crim.R. 7(D) the specification that accompanied Counts One and Two that the murder occurred to escape the accounting for a crime. The specification stated, "The offender committed the offense presented above for the purpose of escaping punishment for another offense committed by him, to-wit: Rape." The prosecutor stated that there was a typographical error and that the specification should state "felonious assault" instead of "rape."

{¶ 68} The defense did not object to amending the specifications. Defense counsel stated, "The prosecutor raised this issue with me * * * several pretrials ago. I had an opportunity to speak to Mr. Maxwell with regards to this. I explained to him certainly we have no objection to this, and he agrees with me in terms of that, and certainly the county prosecutor can, of course, take this back to the Grand Jury to correct the typographical error, if he wishes to do so." The prosecutor was then allowed to amend the specification. Because Maxwell failed to object to the amendment, he has waived all but plain error. *See State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 6.

{¶ 69} Under Crim.R. 7(D), a court may amend an indictment "at any time" if the amendment does not change "the name or identity of the crime charged." An amendment that changes the penalty or degree of the charged offense changes the identity of the offense and is not permitted by Crim.R. 7(D). *State v. Davis*, 121 Ohio St.3d 239, 2008-Ohio-4537, 903 N.E.2d 609, syllabus. However, "[a]s long as the state complies with Crim.R. 7(D), it may cure a

defective indictment by amendment, even if the original indictment omits an essential element of the offense with which the defendant is charged." *State v. Pepka*, 125 Ohio St.3d 124, 2010-Ohio-1045, 926 N.E.2d 611, ¶ 15.

{¶ 70} The amendment to the R.C. 2929.04(A)(3) specification changed the underlying offense from rape to felonious assault. This amendment changed the elements of the specification, because proof of the defendant's commission of the prior offense constituted an essential element of the R.C. 2929.04(A)(3) specification. *See State v. Jones*, 91 Ohio St.3d 335, 347, 744 N.E.2d 1163 (2001). But the name of the crime of aggravated murder was not changed; Maxwell was still charged with an R.C. 2929.04(A)(3) death-penalty specification. The amended specification also did not change the penalty or degree of the offense charged. Thus, the trial court committed no plain error in granting the state's motion to amend the indictment.

{¶ 71} Nevertheless, Maxwell argues that the trial court did not comply with Crim.R. 7(A), because he did not properly waive his right to have the grand jury amend the indictment. Yet Maxwell was prosecuted by indictment and was sufficiently informed of the charges in the indictment. Therefore, Crim.R. 7(A) and its waiver requirements do not apply to this case. *See Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, at ¶ 11.

{¶ 72} Maxwell invokes *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917, *overruled by State v. Horner,* 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 45, in arguing that he had the right to have the grand jury hear and consider the essential facts underlying the amendment of the specification. In *Colon*, this court held that the omission of a mens rea allegation in the indictment was a structural defect that rendered the conviction improper. *Id*. at ¶ 19. Maxwell fails to explain how this holding applies to this case. Moreover, after Maxwell raised the issue in his first brief, this court overruled *Colon* in *Horner*. Thus, we reject this argument.

**{¶ 73}** Finally, even if the amended indictment were defective, it made no difference to the case outcome because the trial court merged the R.C. 2929.04(A)(3) specification with the murder-in-retaliation specification in R.C. 2929.04(A)(8) before the jury considered its penalty-phase verdict. We overrule proposition II.

2. *Ineffective assistance of counsel* (Proposition of law IV)

**{¶ 74}** Maxwell argues that his counsel provided ineffective assistance during jury selection and by failing to object to victim-impact evidence during the guilt phase of the trial.

**{¶ 75}** Reversal of a conviction for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus.

**{¶ 76}** Maxwell first argues that trial counsel's performance must be judged by the standards set forth in the American Bar Association ("ABA") *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (Rev.Ed.2003). The stated objective of the guidelines is "to set forth a national standard of practice for the defense of capital cases in order to ensure high quality legal representation for all persons facing the possible imposition or execution of a death sentence by any jurisdiction." Guideline 1.1(A). To this end, the ABA guidelines present a detailed prescription for the legal representation of capital defendants.

**{¶ 77}** However, the Supreme Court has held that the ABA guidelines are "only guides" to what reasonableness means, not its definition. *Strickland* at 688. In *Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 175 L.Ed.2d 255 (2009), the Supreme Court reversed a Sixth Circuit Court of Appeals decision that relied on

the ABA guidelines to grant a capital defendant relief on the ground that his lawyers performed deficiently in investigating and presenting mitigating evidence. The Supreme Court criticized the Sixth Circuit for treating the guidelines "not merely as evidence of what reasonably diligent attorneys would do, but as inexorable commands with which all capital defense counsel ' "must fully comply." ' " *Id.* at 8, quoting *Van Hook v. Anderson,* 560 F.3d 523, 526 (6th Cir.2009), quoting *Dickerson v. Bagley,* 453 F.3d 690, 693 (6th Cir.2006). The Supreme Court continued, " '[W]hile States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices.' " *Id.* at 9, quoting *Roe v. Flores-Ortega*, 528 U.S. 470, 479, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000).

{¶ 78} Accordingly, trial counsel's performance is reviewed under the two-prong *Strickland* analysis. *See also State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 37-40. We now address Maxwell's specific assertions of ineffective assistance of counsel.

a. Improper use of peremptory challenges

{¶ 79} Maxwell argues that his counsel were ineffective by improperly using peremptory challenges to eliminate women from the jury, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

{¶ 80} In *Batson*, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges so as to exclude members of minority groups from service on petit juries. *Id.* at 89. A court adjudicates a *Batson* claim in three steps. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 61. First the opponent of the

peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. *Batson* at 96-98. Finally, the trial court must decide based on all the circumstances whether the opponent has proved purposeful racial discrimination. *Id.* at 98.

{¶ 81} *Batson* has since been extended to defense peremptory challenges, *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), and gender-based peremptory challenges, *J.E.B.,* 511 U.S. at 144-145.

{¶ 82} Maxwell argues that trial counsel violated the equal-protection rights of five female prospective jurors by peremptorily challenging them: Juanita Gibson, Gail Gibson-Gray, Fahtema Stephens, Carol Dardzinski, and Genevieve Torrero. Gibson, Gibson-Gray, and Stephens were also African-American. During jury selection, defense counsel peremptorily challenged Gibson and stated that she was excused "because of the tragedies that have occurred in her family." Counsel did not make any comments with respect to his peremptory challenge of the other four female prospective jurors.

{¶ 83} Maxwell concedes that the voir dire responses of Gibson, Gibson-Gray, and Stephens provided gender-neutral reasons for trial counsel's peremptory challenge. Maxwell notes that Gibson had been a victim of a sex offense, Gibson-Gray suffered from depression and had been hospitalized for a mental disease, and Stephens had been a victim of domestic violence. Maxwell provides no other argument to support his ineffectiveness claim regarding the peremptory challenge of these three prospective jurors.

{¶ 84} Maxwell's remaining argument is that trial counsel were ineffective in peremptorily challenging Dardzinski and Torrero. But the record includes no discussion of a possible basis for counsel's challenges of these two prospective jurors, because no *Batson* or *J.E.B.* objection was raised. Thus, from the record, we cannot determine whether trial counsel had racially neutral or

gender-neutral explanations for the peremptory challenges and, if so, whether the trial court could have properly accepted such explanations as credible and not a pretext for racial or gender discrimination. Moreover, we cannot presume prejudice from trial counsel's failure to raise a *Batson* or *J.E.B.* challenge. *See State v. Burks*, 10th Dist. Franklin No. 07AP-553, 2008-Ohio-2463, ¶ 57 (court unable to consider defense counsel's failure to raise a *Batson* objection on direct appeal because of an inadequate record).

{¶ 85} Yet Dardzinski's and Torrero's responses on the jury questionnaires appear to provide gender-neutral explanations to support the defense's peremptory challenges. In response to the question "What is your opinion of our Criminal Justice System?" Dardzinski stated, "There are times it can be fair, but I also feel that if someone is convicted of a crime, sentencing is not harsh enough." When asked about her views on the death penalty, Dardzinski stated, "I firmly believe in capital punishment. If someone can just go and kill someone I feel their life should be taken also." When Torrero was asked about her feelings about the death penalty, she responded simply, "My feelings, if you can't do the time don't commit the crime." Based on the foregoing, we hold that Maxwell has failed to establish that trial counsel were deficient by peremptorily challenging female prospective jurors.

b. Failure to life-qualify prospective jurors

{¶ 86} Maxwell argues that trial counsel were ineffective by failing to "life-qualify" a single prospective juror pursuant to *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). *Morgan* held that on voir dire, upon the defendant's request, the trial court must inquire into the prospective juror's views on capital punishment because a prospective juror who would always impose the death penalty must not be empaneled. *Id.* at 729-734. In the present case, the trial court received assurances from all of the seated and alternate jurors that they could vote for one of the life sentences if the state failed

to prove that the aggravating circumstances outweighed the mitigating factors. Thus, counsel were not deficient by failing to also question the jurors about this matter.

c. Failure to object to characterization of the verdict as a recommendation

**{¶ 87}** Maxwell argues that trial counsel were ineffective by failing to object to the trial court's instructions indicating that the jury verdict was merely a recommendation, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). But counsel did object to those instructions.

**{¶ 88}** Moreover, there was no *Caldwell* violation. In *Caldwell*, the jury did not receive an accurate description of its role in the sentencing process due to the prosecutor's suggestion that the jury's decision to impose the death penalty would not be final, because the appellate court would review the sentence for correctness. *Id*. at 328-329. The court concluded that the comment unconstitutionally "led [the jury] to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id*. But when a defendant claims that a *Caldwell* violation occurred, he or she "must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). No *Caldwell* violation occurred in the present case, since the trial court's instructions accurately stated the law, emphasized the jury's responsibility to impose a sentence, and did not induce reliance on the prospect of appellate review. *See State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 102.

d. Failure to object to victim-impact testimony

**{¶ 89}** Maxwell argues that trial counsel were ineffective by failing to object to victim-impact testimony that was presented at trial. Maxwell also challenges the introduction of this evidence in proposition of law X. But as

discussed in that proposition, trial counsel were not ineffective by failing to object to this evidence, because its admission was either proper or not prejudicial.

{¶ 90} Based on the foregoing, we reject proposition IV.

3. *Jury challenges* (Propositions of law V and VI)

{¶ 91} In proposition of law V, Maxwell argues that the trial court had an obligation to determine sua sponte whether trial counsel had gender-neutral reasons to peremptorily challenge five female prospective jurors. Maxwell failed to assert a *J.E.B.* challenge at trial and thus waived all but plain error. *See State v. Ballew*, 76 Ohio St.3d 244, 253, 667 N.E.2d 369 (1996) (failure to raise a *Batson* challenge constituted waiver).

{¶ 92} In raising a *J.E.B.* challenge, "a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B.*, 511 U.S. at 144-145, 114 S.Ct. 1419, 128 L.Ed.2d 89. Without an objection from either defense counsel or the prosecutor, the trial court had no obligation to raise a *J.E.B.* challenge on its own motion. Moreover, the record includes no discussion of a possible basis for counsel's challenges, because a *J.E.B.* issue was never raised. In the absence of an adequate record, we find that no plain error occurred.

{¶ 93} In proposition of law VI, Maxwell argues that the trial court erred in denying a defense challenge against juror Gibson because she was biased. Maxwell also argues that he suffered prejudice because he was forced to use a peremptory challenge against Gibson after the trial court denied the challenge for cause.

{¶ 94} A trial court has broad discretion in determining a prospective juror's ability to be impartial. *State v. White*, 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998). Former R.C. 2313.42(J) (now R.C. 2313.17(B)(9)) stated that good cause exists for the removal of a prospective juror when "he discloses by his

answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." Former R.C. 2313.43 (now R.C. 2313.17(D)); *see State v. Cornwell*, 86 Ohio St.3d 560, 563, 715 N.E.2d 1144 (1999). A trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion. *Id.*

{¶ 95} During voir dire, juror Gibson stated that she had been sexually assaulted about five years previously and that her assailant had been recently apprehended. Gibson did not have to testify against the defendant, because there was a plea bargain and he received a one-year sentence. Gibson stated that she had met with Carol Skutnik of the Cuyahoga County prosecutor's office once or twice before trial. As to her dealings with the prosecutor's office, Gibson stated, "They did everything the way they were supposed to I believe. I didn't have any issues with them." As a follow-up question, trial counsel asked Gibson about her experience with the prosecutor's office: "Do you think that's going to somehow possibly taint the way you view this case against my client?" Gibson responded, "Why would it? No, I don't. One has nothing to do with [the] other."

{¶ 96} Maxwell argues that juror Gibson should have been excused as a juror because she had been the victim of a sexual assault and her previous relationship with the prosecutor's office posed a risk that she would find the prosecutor's case against Maxwell more credible. Yet Gibson's answers showed that she would be a fair-minded juror. Nothing indicates that Gibson's experiences as a sexual-assault victim would cause her to be biased against Maxwell. Gibson also assured the court that her prior dealings with a different Cuyahoga County prosecutor would not influence her consideration of Maxwell's case. *See State v. Allen*, 73 Ohio St.3d 626, 629, 653 N.E.2d 675 (1995) (prospective juror whose brother was a homicide victim permitted to remain as

capital juror after assuring the court that she could set that aside and remain impartial). Thus, we hold that the trial court did not abuse its discretion in rejecting this challenge for cause. We also reject Maxwell's contention that the defense was forced to use a peremptory challenge against Gibson.

{¶ 97} Based on the foregoing, we overrule propositions V and VI.

4. *Competency of child witness* (Proposition of law III)

{¶ 98} Maxwell argues that the trial court erred in finding that C.M. was competent to testify at trial. He argues that the record fails to establish that C.M. was able to distinguish right from wrong and understand the difference between the truth and a lie.

{¶ 99} Evid.R 601 provides: "Every person is competent to be a witness except: (A) * * * children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."

{¶ 100} A trial court must conduct a voir dire examination of a child under ten years of age to determine the child's competence to testify. In making this determination, the court must consider

> (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful.

*State v. Frazier*, 61 Ohio St.3d 247, 251, 574 N.E.2d 483 (1991). A determination of competency is within the sound discretion of the trial court and will not be reversed on appeal absent a clear abuse of discretion. *Id.* at 250-251.

{¶ 101} C.M. was five years old when she testified. She was one day short of her fourth birthday when she witnessed her mother being killed. During the voir dire examination to determine her competency, C.M. stated the name of her brother and sister and mentioned that she attended preschool and knew her teacher's name. She stated that her favorite TV show was "Sponge Bob" and named the characters on the show and mentioned their characteristics. C.M. also identified photographs of the different rooms in her house. C.M. showed that she knew what it meant to tell the truth and stated, "You will get in trouble" if you tell a lie. Finally, C.M. related what happened the night her mother was killed. C.M. stated that her "daddy" came to the house with a gun, that he was in her "Mommy room," and that the three of them went downstairs. Asked what Maxwell did with the gun, she stated, "He shoot my mommy."

{¶ 102} Following voir dire, the trial court stated, "[C.M.] is capable of receiving just impressions, she understands the importance of telling the truth, and, therefore, the Court rules that she will be allowed to testify. She's competent as a witness in this case."

{¶ 103} Maxwell argues that the trial court abused its discretion because nothing shows that C.M. understood the significance of upholding the oath or the consequences of lying under oath. However, trial counsel objected to C.M.'s competency on the grounds that she was unable to adequately recall "material facts and impressions," rather than her lack of understanding the significance of an oath. Evid.R. 103(A) requires that an objection state the specific grounds upon which it based. Thus, Maxwell's objection to C.M.'s competency on different grounds than he now complains about constitutes waiver absent a showing of plain error. *See State v. Wade*, 53 Ohio St.2d 182, 188, 373 N.E.2d 1244 (1978).

{¶ 104} C.M. was not asked whether she understood the significance of taking an oath or lying under oath. But a child "need not have religious beliefs or detailed knowledge of the nature of the oath." *State v. Eastham*, 39 Ohio St.3d

307, 313, 530 N.E.2d 409 (1988) (Brown, J., concurring). Rather, "it must be shown that the child understands the duty to tell the truth and that some punishment will follow if the child fails to tell the truth." *Id*. C.M. demonstrated that she understood the concept of truthfulness and knew that there were consequences for not telling the truth during voir dire:

> Q. And, [C.M.], do you know the difference between telling the truth and telling a lie?
>
> A. Yes.
>
> Q. And what's the difference?
>
> A. The difference, when you don't tell the truth—
>
> Q. Uh-huh?
>
> A. —you could get in trouble.
>
> Q. Okay. And if you tell the truth, what happens? Is it good to tell the truth?
>
> A. Yes.
>
> Q. Okay. What happens if you tell a lie?
>
> A. You will get in trouble.

{¶ 105} Thus, the record supports the trial court's finding that C.M. understood the importance of telling the truth in finding that she was competent. Moreover, we do not find an abuse of discretion simply because C.M. was only five years old at the time of trial. *See State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 73-87 (child witness who was six years old at trial and five years old when he witnessed the murder competent to testify); *State v. Allard*, 75 Ohio St.3d 482, 496-497, 663 N.E.2d 1277 (1996) (child eyewitness to two murders who was five years old at trial and four years old when he witnessed the murders competent to testify).

{¶ 106} As an alternative argument, Maxwell claims that the trial court abused its discretion in finding C.M. competent because her testimony showed she was confused and unable to accurately relate her observations. During cross-examination, C.M. stated that she sometimes went horseback riding with her father in the house. Maxwell claims that he went horseback riding with real horses and not pretend horses and that C.M.'s answers showed her confusion and possible fantasy.

{¶ 107} Maxwell incorrectly asserts that this testimony was presented during the competency hearing. Instead, C.M.'s cross-examination about horseback riding occurred during the state's case-in-chief. Once C.M. was deemed competent to testify, her credibility, like that of any other witness, must be determined by the trier of fact. 1 Giannelli, *Evidence*, Section 601.6, at 433 (3d Ed.2010). Thus, we reject Maxwell's claim that this segment of C.M.'s cross-examination shows that C.M. was incompetent.

{¶ 108} In conclusion, we hold that the trial court committed no plain error in finding that C.M. was competent to testify. Proposition III is overruled.

5. Miranda *compliance* (Proposition of law XIII)

{¶ 109} Maxwell argues that the trial court erred in admitting his statements to police at the time of his arrest, because the police had failed to advise him of his *Miranda* rights before questioning him. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 110} Before trial, Maxwell moved to suppress statements that he made in response to police questioning about whether he was armed at the time of his arrest. During the suppression hearing, Agent Robert Riddlebarger testified that on December 16, 2005, he and six other members of the Cleveland/Cuyahoga County Fugitive/Gang Task Force went to a home on Jeffries Avenue in Cleveland to arrest Maxwell. Task-force members entered the house after knocking on the door and not receiving a response. According to Riddlebarger,

the task force was "looking for persons, or * * * anything that might be used as a weapon against us." The team members searched the basement and the first-floor area and found nothing. The entire task force then went upstairs to clear the second floor. The team members separated and searched the two bedrooms on that floor.

{¶ 111} Team members cleared both bedrooms. In one bedroom, team members noticed a crawl-space door behind the bed. They moved the bed, opened the door, and found Maxwell. Riddlebarger and Det. Zickes pulled Maxwell out of the crawl space, placed him face down on the bed, and handcuffed him. Riddlebarger testified, "At about the same time as he's handcuffed, * * * Detective Zickes asked Mr. Maxwell whether or not he was armed." Maxwell responded that "he did not have a gun anymore." Riddlebarger then patted Maxwell down for weapons and searched his clothing to make sure that he did not have any weapons on him. During the pat-down, Maxwell stated that he "had gotten rid of the gun that he once had."

{¶ 112} The trial court overruled the defense motion to suppress Maxwell's statements. The court stated, "In this case, as in [*New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)], there was a public safety exception to the requirement that Miranda warnings be given before a subject's answers could be admitted into evidence * * *." Later, Riddlebarger testified during the state's case-in-chief regarding Maxwell's statements at the time of his arrest.

{¶ 113} Under *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." However, when officers ask "questions necessary to secure their own safety or the safety of the public" as opposed to "questions designed solely to

elicit testimonial evidence from a suspect," they do not need to provide the warnings required by *Miranda*. *New York v. Quarles*, 467 U.S. 649, 659, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

{¶ 114} In *Quarles*, the police apprehended a rape suspect in a supermarket and discovered that he was wearing an empty shoulder holster. Before reading *Miranda* rights to the suspect, an officer asked the suspect where the gun was located. The suspect nodded toward some empty cartons and stated, "[T]he gun is over there." *Quarles* at 652. In upholding the admissibility of the defendant's statement, the court stated:

> The police in this case * * * were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

*Id.* at 657.

{¶ 115} Recognizing a narrow exception to the *Miranda* rule, *Quarles* reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id.* In so holding, the court stated:

> We decline to place officers * * * in the untenable position of having to consider, often in a matter of seconds, whether it best

35

serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

*Id*. at 657-658. *Quarles* indicated that this limited exception will not be difficult for police officers to apply "because in each case it will be circumscribed by the exigency which justifies it." *Id*. at 658.

{¶ 116} Maxwell argues that *Quarles* did not justify the police questioning him about whether he was armed without first advising him of his *Miranda* rights. Maxwell argues that he was handcuffed before he was asked about the weapon. He also argues that the public-safety exception does not apply, because he was arrested inside a private home that had been completely secured by the police.

{¶ 117} In *United States v. Williams*, 483 F.3d 425, 428 (6th Cir.2007), the United States Court of Appeals for the Sixth Circuit set forth the standard that the government must satisfy in order for custodial statements made before any *Miranda* warnings to be admissible under the *Quarles* public-safety exception. "For an officer to have a reasonable belief that he is in danger," and thus for the exception to apply, "he must have reason to believe (1) that the defendant might have (or recently have had) a weapon, and (2) that someone other than police might gain access to that weapon and inflict harm with it." *Id*. at 428. *Williams* stated that this evaluation of the applicability of the *Quarles* exception "takes into consideration a number of factors, which may include the known history and characteristics of the suspect, the known facts and circumstances of the alleged

crime, and the facts and circumstances confronted by the officer when he undertakes the arrest."[1]  *Id.*

{¶ 118} In the present case, the first condition was satisfied because the members of the task force had a reasonable belief that Maxwell might possess a weapon.  Evidence suggested that he possessed weapons and had recently shot Nichole.  But the second condition was not met.  When Maxwell was questioned, the task force had secured the premises, performed a sweep of the house, and determined that no one else was present.  Maxwell was handcuffed and surrounded by several task-force members.  The house was under full control of the agents during the questioning.  These facts contrast with those of *Quarles,* in which a discarded gun in a supermarket presented a threat to public safety.

{¶ 119} Nevertheless, the state argues that Det. Zickes could ask Maxwell whether or not he was armed because an officer's safety is *always* at risk, especially when the arrest occurs in the defendant's home.  But the *Williams* test provides that in applying the *Quarles* exception, it is necessary to consider the facts and circumstances confronted by the police at the time of arrest, and here, nothing suggested that Maxwell might gain access to a weapon and inflict harm with it.

{¶ 120} In *United States v. Kellogg*, 306 Fed.Appx. 916 (6th Cir.2009), the court evaluated a similar fact situation involving the application of the public-safety exception.  In *Kellogg*, the police asked the defendant, who was suspected of bank robbery, whether he had a gun or drugs on the premises before searching his home.  *Id.* at 918.  The court rejected claims that the public-safety exception

---

1. Some Ohio courts of appeals have adopted a four-part test to determine whether the public-safety exception applies: " 'In order to establish that the exception is warranted in any given case, the State must show that: (1) there was an *objectively* reasonable need to protect the police or the public, (2) from an *immediate* danger, (3) associated with a weapon, and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety.' (Emphasis sic.)"  *State v. Garnett*, 10th Dist. Franklin No. 09AP-1149, 2010-Ohio-5865, ¶ 32, quoting *State v. Jergens,* 2d Dist. No. 13294 (Sept. 3, 1993).

allowed defendant's incriminating responses to be admitted at trial. The court stated that the suspicion that the defendant had recently committed a bank robbery satisfied the first prong of the *Williams* standard. *Id.* at 924. However, the court stated that the second prong of the *Williams* standard was not met:

> [S]ince the arresting officers had just ordered all of the occupants out of the duplex, handcuffed Kellogg and conducted a security sweep of the residence, there was no reason to believe that a weapon would be immediately accessible to individuals other than police. Thus, the immediate danger to the officers or the public was insufficient to justify the officers' failure to inform Kellogg of his rights prior to eliciting incriminating statements regarding the items in the duplex.

*Id*. *See also United States v. Brathwaite*, 458 F.3d 376, 382 (5th Cir.2006), fn. 8 (rejecting application of the public-safety exception where police secured the suspect and his coresidents, conducted two security sweeps, and gained control over the residence).

{¶ 121} Maxwell made two statements after Det. Zickes asked him whether he was armed. His first statement, that he did not have a gun anymore, was in direct response to Zickes's question. His second statement, that "he got rid of the gun that he once had," was made while Riddlebarger was patting him down. Riddlebarger testified that this was an unsolicited response and was not made in response to further questioning.

{¶ 122} The admissibility of Maxwell's second statement depends on whether it was a continuation of his response to police questioning about whether he was armed. In determining whether one statement is a continuation of the previous statement, a court should consider factors such as whether the content in

the statements overlap, the timing and setting of each statement, and the continuity of personnel. *See State v. Clark*, 7th Dist. Mahoning No. 08MA15, 2009-Ohio-3328, 2009 WL 1915211, ¶ 24. Maxwell's second response was made seconds after his first response, addressed the same matter, and was made to the same officers in the room. Thus, we conclude that both statements were improperly obtained in violation of *Miranda*.

**{¶ 123}** Because Maxwell's statements were improperly admitted into evidence, we must determine whether the error was reversible or harmless. "A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt." *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 78, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). We hold that the erroneous admission of Maxwell's statements was harmless beyond a reasonable doubt in view of the remaining evidence establishing Maxwell's guilt.

**{¶ 124}** Properly admitted evidence provided overwhelming evidence of Maxwell's guilt. Gregg testified that Maxwell was very upset after Nichole testified at the grand jury and that he said, "[T]he bitch is going to make me kill her." He also asked Gregg where he could get a gun. Four days later, Maxwell violated a temporary protection order and went to Nichole's house with a gun. Lauretta confronted Maxwell at the house, Maxwell fired shots, and she observed Maxwell standing over Nichole's body before he fled the scene. C.M. also witnessed Maxwell shooting her mother. Moreover, Maxwell called Gregg and admitted shooting Nichole that night.

**{¶ 125}** Based on the foregoing, we overrule proposition XIII.

6. *Admissibility of Nichole's phone conversation with Maxwell* (Proposition of law XIV)

{¶ 126} Maxwell argues that the trial court erred by admitting a segment of Nichole's telephone conversation with him, because it was inadmissible hearsay and violated his Sixth Amendment right to confrontation.

{¶ 127} On November 23, 2005, Nichole testified before the grand jury about the felonious assault. That evening, Maxwell called Gregg and told him that he had been trying to talk to Nichole about her grand jury testimony but had been unable to contact her. Maxwell then phoned Nichole while Gregg remained on the line, and Gregg heard their conversation. Gregg testified as follows:

Q: And did Mr. Maxwell say anything to Ms. McCorkle?

A: Yes, he did.

Q: What did he say?

A: He asked her what had happened in court that day.

Q: Did she respond?

Mr. Luskin [defense counsel]: Objection.

A: Yes, she did.

The Court: Overruled.

Q: What did she say?

Mr. Rein [defense counsel]: Objection.

The Court: Overruled.

A: She had told him that—she was very sincere when she said it—but she said I told the truth. I had to tell the truth.

Q: After she tells him that, how long after that—how long was the conversation all together?

A: A few minutes, not real long. Four or five minutes.

Q: Was there much conversation after she told him that she had to tell the truth?

A: No, there was not.

{¶ 128} Maxwell argues that Nichole's statement that she "told the truth" was inadmissible hearsay and constituted a testimonial statement that violated the Confrontation Clause in violation of *Crawford* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. The state argues that Nichole's statement was not admitted for the truth of the matter asserted and was not a testimonial statement.

{¶ 129} Out-of-court statements offered to prove the truth of the matter asserted are generally inadmissible as hearsay. Evid.R. 801 and 802. If a statement is not offered for the truth of the matter asserted, however, it is not prohibited by the hearsay rule and will be admissible, subject to the standards governing relevancy and undue prejudice. Evid.R. 402 and 403; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 59. "It is well established that extrajudicial statements made by an out-of-court declarant are properly admissible to explain the actions of a witness to whom the statement was directed." *State v. Thomas*, 61 Ohio St.2d 223, 232, 400 N.E.2d 401 (1980); *see also* 2 Giannelli, *Evidence*, Section 801.10, at 138 (3d Ed.2010).

{¶ 130} Nichole's statement that she testified truthfully before the grand jury was not offered to prove the truth of the matter asserted but to prove the effect of the statement on the listener, Maxwell. The statement was relevant because it set into motion the chain of events leading to the confrontation between Maxwell and Nichole and her shooting a few nights later. Thus, the trial court did not err in admitting Nichole's statement.

{¶ 131} We also reject Maxwell's *Crawford* claim. In *Crawford*, the Supreme Court held that it is a violation of the Confrontation Clause to admit "testimonial statements of a witness who did not appear at trial unless he was

unavailable to testify and the defendant had had a prior opportunity for cross-examination." *Crawford,* 541 U.S. at 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177. *Crawford* also stated that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59, fn. 9, citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985).

{¶ 132} Nichole's statement did not implicate Maxwell's confrontation rights. Nichole's out-of-court statement, repeated by Gregg, served the purpose of explaining how certain events came to pass or why Maxwell confronted and shot Nichole. *See United States v. Cromer*, 389 F.3d 662, 676 (6th Cir.2004). Because the statements were not offered to establish the truth of the matter asserted, the Confrontation Clause did not apply.

{¶ 133} Based on the foregoing, we overrule proposition XIV.

7. *Victim-impact testimony* (Proposition of law X)

{¶ 134} Maxwell argues that the trial court erred in admitting victim-impact testimony during the guilt phase of the trial. Except where noted, defense counsel failed to object to such evidence and thus waived all but plain error. *See State v. Reynolds*, 80 Ohio St.3d 670, 679, 687 N.E.2d 1358 (1998).

{¶ 135} "Evidence relating to the facts attendant to the offense is 'clearly admissible' during the guilt phase, even though it might be characterized as victim-impact evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 98, quoting *State v. Fautenberry*, 72 Ohio St.3d 435, 440, 650 N.E.2d 878 (1995).

{¶ 136} First, Maxwell complains that Nichole's sister, Michelle Kenney, provided improper victim-impact testimony about family history and other personal matters. Michelle mentioned the names and ages of Nichole's children and her siblings and stated that Nichole had been married and divorced but kept her married name. Michelle also described the inside of Nichole's home at 1046

East 146th Street. Maxwell also complains that Michelle testified that Nichole wanted the women's biological father, Heinz Kenney, to move into her house after he was released from prison in July 2005 "because he was sick and everything."

{¶ 137} The testimony about Nichole's family and her divorce provided background information about Nichole's relationship with Maxwell and the witnesses who testified. Testimony about family members living at the house and information about the layout of the house showed the people who had access to the house and described where the shooting occurred. Moreover, none of this testimony was overly emotional. Thus, we hold that no plain error occurred.

{¶ 138} Second, Maxwell contends that Michelle and Lauretta Kenney improperly testified about their frequent phone contact with Nichole. Michelle testified that she had daily contact with Nichole and talked with her on the phone every day. Lauretta also testified that she had daily contact with Nichole and spoke to her on the phone "[f]our or five times a day."

{¶ 139} Maxwell also asserts that Michelle improperly testified that after the shooting, she went to the hospital and saw Nichole "laying on an ambulance gurney * * * and she had all these tubes in her and she had a hose in her head and it was just blood everywhere." Michelle also mentioned that family members discussed the possibility that they might have to decide whether to continue Nichole on life support. However, Nichole died before that decision was necessary.

{¶ 140} Michelle's and Lauretta's frequent phone contact with Nichole was relevant in explaining their awareness of and involvement in the events leading up to Nichole's murder. Michelle's graphic description of Nichole's medical condition at the hospital and her testimony about the family discussion on discontinuing life support were of more questionable relevance. But we hold that no plain error resulted from admitting this testimony.

**{¶ 141}** Third, Maxwell argues that the prosecutor improperly had C.M. identify a photograph of her mother. However, Maxwell is incorrect. C.M. identified a photograph of the bloodstained carpet where her mother was lying after she had been shot. Nichole's body was not in the picture. Thus, we reject this claim.

**{¶ 142}** Finally, Maxwell complains that Dr. Joseph Felo, the chief deputy coroner for Cuyahoga County, improperly testified about the pain that Nichole must have suffered from one of the gunshot wounds. Dr. Felo testified that one of the gunshot wounds went through the right eyeball and that there would have been "excruciating pain associated with that." The trial court sustained a defense objection to this testimony and instructed the jury to disregard the answer.

**{¶ 143}** Maxwell suffered no prejudice from Dr. Felo's testimony about pain that Nichole suffered, because the trial court instructed the jurors to disregard Dr. Felo's comments. *See State v. Heinish*, 50 Ohio St.3d 231, 241, 553 N.E.2d 1026 (1990) ("Where a jury is cautioned and a correction is given to the jury, the effect of improper evidence may be cured"). The trial court also sustained objections on two other occasions when Dr. Felo began to refer to the victim's pain.

**{¶ 144}** Based on the foregoing, we overrule proposition X.

8. *Sufficiency of the evidence* (Proposition of law VII)

a. Evidence of prior calculation and design

**{¶ 145}** Maxwell argues that the state failed to prove that he murdered Nichole with prior calculation and design as charged in Count One.

**{¶ 146}** When a court reviews a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v.*

*Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 147} Maxwell was convicted of one count of aggravated murder under R.C. 2903.01(A), which states: "No person shall purposely, and with prior calculation and design, cause the death of another * * *."

{¶ 148} No bright-line test exists that "emphatically distinguishes between the presence or absence of 'prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." *State v. Taylor*, 78 Ohio St.3d 15, 20, 676 N.E.2d 82 (1997). However, when the evidence presented at trial "reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190 (1978), paragraph three of the syllabus.

{¶ 149} Maxwell argues that the evidence shows that he spontaneously shot Nichole after observing her with another man, kissing him goodnight, and receiving phone calls from him at home. Thus, Maxwell asserts that the evidence is insufficient to support a conviction of prior calculation and design.

{¶ 150} Maxwell's argument overlooks the evidence showing that he shot Nichole in retaliation for her failure to change her grand jury testimony about the felonious assault. Gregg testified that at Maxwell's behest, he had contacted Nichole and asked her to "stick to the story that it was a simple domestic" incident when she testified before the grand jury. Nichole later told Maxwell that she had told the truth during her grand jury testimony. Maxwell then told Gregg

that "the bitch was going to make him kill her" and asked Gregg where he could get a gun. Maxwell went to Nichole's home and killed her four days later.

{¶ 151} We have previously held that a defendant's threat to obtain a weapon and kill his victim and his later actions carrying out that threat are enough to prove prior calculation and design. *Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, at ¶ 45; *State v. Sowell*, 39 Ohio St.3d 322, 333, 530 N.E.2d 1294 (1988). Maxwell announced his intention to kill Nichole, and he never abandoned that plan. Moreover, according to Gregg's testimony, Maxwell told Gregg that when he shot Nichole "she fell down and * * * she moved and then he shot her again." The second gunshot belies Maxwell's argument that the murder was spontaneous, and his actions show that he was carrying out his stated intention to kill Nichole for testifying against him.

{¶ 152} In *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, we addressed a similar fact situation. On July 18, 2005, Fry and Tamela Hardison had a fight in the apartment where they lived. *Id*. at ¶ 7. Hardison then filed charges against Fry for assault and aggravated menacing. *Id*. at ¶ 148. While in pretrial custody, Fry told Hardison to go to court and drop the charges. On July 21, Fry told Hardison that he had received paperwork that she had signed saying that he had assaulted and threatened her. During that conversation, Fry told Hardison, "I got two of them under my belt * * * toe tags," meaning that he had killed two people. He then told Hardison, "Fix this." *Id.* at ¶ 150. Fry was released from jail on July 25 and killed Hardison on July 31. We upheld the sufficiency of the evidence and stated that there was sufficient time, reflection, and activity involved in Hardison's murder to show that Fry killed her with prior calculation and design. *Id*. at ¶ 157.

{¶ 153} Just as in *Fry*, Maxwell demanded that Nichole lie to the grand jury to have his charges reduced. Maxwell later learned that Nichole had told the truth during her grand jury testimony, and he then expressed his intent to kill

Nichole. As in *Fry,* several days elapsed, and then Maxwell went to Nichole's house and killed her. Construing the evidence in a light most favorable to the prosecution, a rational juror could have concluded beyond a reasonable doubt that Maxwell had formulated a plan to kill Nichole. Thus, we hold that there was sufficient time, reflection, and activity involved in Nichole's murder to show that Maxwell killed her with prior calculation and design.

b. Evidence proving witness-murder specification (Proposition of law VIII)

{¶ 154} Maxwell argues that the state failed to prove his guilt on the witness-murder specification.

{¶ 155} Maxwell was convicted of the R.C. 2929.04(A)(8) death-penalty specification that the victim "was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding."

{¶ 156} Maxwell continues to argue that the evidence showed that he killed Nichole because he was upset with her for socializing with another man and kissing him goodnight. Maxwell asserts that this motive superseded evidence that he murdered Nichole in retaliation for her grand jury testimony. Thus, he argues that the evidence is insufficient to support an (A)(8) finding.

{¶ 157} As discussed in proposition of law VII, the evidence shows that Gregg, at Maxwell's behest, contacted Nichole and attempted to persuade her to change her grand jury testimony to obtain a charge reduction against Maxwell. Upon learning that Nichole did not change her testimony, Maxwell stated his intent to kill Nichole and asked Gregg where he could get a gun. Maxwell shot and killed Nichole four days later.

{¶ 158} Although the evidence supports a finding that Maxwell killed Nichole for testifying against him, the state was not required to prove that that was Maxwell's *sole* reason for killing Nichole. *Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 153. Even assuming that jealousy was also a

motive for the murder, we hold that the state presented sufficient evidence to prove the R.C. 2929.04(A)(8) specification.

c. Elements of witness-murder specification (Proposition of law IX)

{¶ 159} Maxwell maintains that the state failed to present sufficient evidence to prove the R.C. 2929.04(A)(8) specification, that he killed Nichole to prevent her "testimony in any criminal proceeding."

{¶ 160} Nichole testified before the grand jury on Wednesday, November 23, 2005. According to Brian Mooney, Cuyahoga County assistant prosecutor at the time of the murder, the grand jury returned a true bill against Maxwell for felonious assault, abduction, and domestic violence on November 23. Because the next day was Thanksgiving, the indictment was not filed with the clerk of court until Monday, November 28, 2005.

{¶ 161} Maxwell argues that the (A)(8) specification is inapplicable because the indictment for felonious assault was not filed until the day after the murder and no criminal proceeding was underway. In support of this argument, Maxwell cites R.C. 2901.13(E), which states, "A prosecution is commenced on the date an indictment is returned or an information filed * * *." He also cites Crim.R. 55(A), which states: "An action is commenced for purposes of this rule by the earlier of, (a) the filing of a complaint, * * * indictment, or information with the clerk, or (b) the receipt by the clerk of the court of common pleas of a bind over order under Rule 5(B)(4)(a)."

{¶ 162} R.C. 2929.04(A)(8) does not require that a criminal action be pending when the defendant kills the witness. Indeed, a defendant can be charged with the witness-murder specification in situations in which no criminal proceeding has been initiated at the time the victim was murdered. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 55. The statute requires only (1) that the victim was a witness to an offense and (2) that the

purpose of killing the witness was to prevent the victim from testifying in a criminal proceeding.  *Id*.

{¶ 163} As discussed above, the evidence established that Maxwell killed Nichole because she testified against him before the grand jury.  Accordingly, we hold that Maxwell's guilt of the R.C. 2929.04(A)(8) specification was established by proof beyond a reasonable doubt even though the indictment for felonious assault was not filed until the day after Nichole's murder.

{¶ 164} Based on the foregoing, we reject propositions VII, VIII, and IX.

*B. Penalty-phase issues*

1. *Ineffective assistance of counsel*  (Proposition of law I)

{¶ 165} Maxwell argues that his counsel failed to develop and present evidence of his mental retardation, failed to investigate and present mitigating evidence, and committed other errors during the penalty phase.

a. Failure to present evidence of mental retardation

{¶ 166} Maxwell argues that trial counsel failed to properly develop evidence showing that he was mentally retarded and failed to request a hearing to determine whether he was mentally retarded pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).  He also argues that trial counsel failed to present such evidence during mitigation.  Maxwell relies on evidence presented during his competency proceedings and testimony presented during the penalty phase.

(1) *Facts*

{¶ 167} During the competency hearing, Dr. Michael Aronoff, a psychologist at the Court Psychiatric Clinic, testified that he had evaluated Maxwell and administered the Wechsler Abbreviated Scale of Intelligence.  These test results showed that Maxwell had a full-scale IQ score of 72, which is in the borderline range.  He also had a verbal IQ score of 68, which is in the range of mild mental retardation, and a performance IQ score of 83, which is in the low

average range. Dr. Aronoff testified that earlier IQ test scores were not found in Maxwell's school records or any other records.

{¶ 168} Dr. Aronoff administered other tests, including the Competency Assessment to Stand Trial for Defendants with Mental Retardation ("CAST*MR"). Dr. Aronoff testified that Maxwell's low score on that test was significant "because he didn't come up with a mentally retarded IQ score and he's had prior experience with the legal system." Due to the possibility of malingering on the CAST*MR, Dr. Aronoff recommended that Maxwell be referred to the court evaluation unit of the North Coast Behavioral Health Care System for a 20-day inpatient competency evaluation. The trial court ordered that Maxwell be referred for such treatment.

{¶ 169} Dr. Alice Cook, a clinical psychologist, evaluated Maxwell during his inpatient treatment at North Coast. During the competency hearing, Dr. Cook testified that she performed no additional testing but was aware that Maxwell had attained a verbal IQ score of 68 during earlier testing. But Dr. Cook indicated that Maxwell was not mentally retarded. She stated, "In order to have a diagnoses of mental retardation, it needed to be identified prior to the age of 18, and there was no indication of any records from anyplace that he had been identified prior to age 18 as being mentally retarded."

{¶ 170} During the competency proceedings, defense counsel mentioned that Dr. John Fabian, a board-certified psychologist, had also met with Maxwell to assess his condition. Dr. Fabian was not called as a witness, and his assessment of Maxwell was never introduced. Following the competency hearing, the trial court ruled that Maxwell was competent to stand trial. Defense counsel presented no argument that Maxwell was mentally retarded and did not request an *Atkins* hearing.

{¶ 171} During the penalty phase, Dr. Sandra McPherson, a clinical psychologist, testified as a defense mitigation witness. Dr. McPherson evaluated

Maxwell and administered the Wechsler Adult Intelligence Scale and wide-range achievement test. Dr. McPherson testified that Maxwell attained a full-scale IQ score of 84, which placed him in the low average range. Maxwell also attained a performance IQ score of 95 and a verbal IQ score of 77.

(2) *Analysis*

{¶ 172} On June 20, 2002, the Supreme Court of the United States ruled that the execution of a mentally retarded criminal violates the Eighth Amendment's ban on cruel and unusual punishments. *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335. *Atkins* left to the states " 'the task of developing appropriate ways to enforce the constitutional restriction' " on executing the mentally retarded. *Id*. at 317, quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

{¶ 173} In *State v. Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, this court developed procedures and substantive standards for resolving *Atkins* claims. *Lott* adopted a three-part test, which had been cited with approval in *Atkins*, 536 U.S. at 308, fn. 3, that defined mental retardation as (1) significantly subaverage intellectual functioning, (2) significant limitations in two or more adaptive skills, such as communication, self-care, and self-direction, and (3) onset before the age of 18. *Lott* at ¶ 12. *Lott* went on to state:

> Most state statutes prohibiting the execution of the mentally retarded require evidence that the individual has an IQ of 70 or below. * * * While IQ tests are one of many factors that need to be considered, they alone are not sufficient to make a final determination on this issue. * * * We hold that there is a rebuttable presumption that a defendant is not mentally retarded if his or her IQ is above 70.

*Id.*

**{¶ 174}** First, Maxwell argues that trial counsel were ineffective by failing to request an *Atkins* hearing because IQ testing administered by Dr. Aronoff showed that he had a verbal IQ score of 68.

**{¶ 175}** In order for counsel's inadequate performance to constitute a Sixth Amendment violation, Maxwell must show that counsel's performance was deficient and prejudiced him. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that courts "apply[] a heavy measure of deference to counsel's judgments" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 691 and 689.

**{¶ 176}** Maxwell fails to establish that trial counsel were deficient in failing to request an *Atkins* hearing. The results of two full-scale IQ tests showed that Maxwell's IQ was above 70. Dr. McPherson testified that Maxwell's IQ score was 84, which is significantly higher than the *Lott* cutoff level. There is also no evidence that Maxwell suffered "significant limitations in two or more adaptive skills." *Lott*, 97 Ohio St.3d 303, 2002-Ohio-6625, 779 N.E.2d 1011, at ¶ 2. Finally, Dr. Cook testified that Maxwell is not mentally retarded, because there was "no indication" of "any records from anyplace that he had been identified prior to age 18 as being mentally retarded." *Id.*

**{¶ 177}** Maxwell argues that trial counsel were ineffective by allowing Maxwell to be retested after earlier testing had potentially excluded him from death eligibility. But Maxwell has not shown how Dr. McPherson's testing amounted to deficient performance. Dr. McPherson was an expert in this area, and she determined which tests to administer. *See State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 150.

**{¶ 178}** Moreover, if trial counsel had requested an *Atkins* hearing, the trial court would have conducted a de novo review of the evidence in determining

whether the defendant was mentally retarded. *See Lott* at ¶ 18. *Lott* states, "The trial court should rely on professional evaluations of [a defendant's] mental status, and consider expert testimony, appointing experts if necessary in deciding this matter." *Id.* Thus, it is very likely that the trial court would have appointed other experts to evaluate Maxwell and further testing would have been administered to determine whether he was mentally retarded. Such testing would have likely included the use of more definitive tests, like the Wechsler Adult Intelligence scale, which Dr. McPherson administered.

{¶ 179} Maxwell also argues the additional test results were invalid because they failed to take into account the "Flynn effect." The Flynn effect postulates that IQ scores rise over time and that IQ tests that are not renormed to adjust for rising IQ levels will overstate a testee's IQ. *Walker v. True*, 399 F.3d 315, 322 (4th Cir.2005). However, nothing about Maxwell's Flynn-effect adjusted IQ scores was presented during the trial or appears in the record. "A reviewing court cannot add matter to the record before it, which was not part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), paragraph one of the syllabus. Thus, these speculative claims are rejected.

{¶ 180} Second, Maxwell argues that trial counsel were ineffective in failing to present evidence of his low intelligence during the penalty phase. Maxwell claims that counsel were deficient by failing to call Dr. Aronoff as a mitigation witness to testify about Maxwell's borderline intellectual functioning and his low IQ scores. "The defense decision to call or not call a mitigation witness is a matter of trial strategy. * * * Likewise, the scope of questioning is generally a matter left to the discretion of defense counsel. Debatable trial tactics generally do not constitute ineffective assistance of counsel." *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 116.

**{¶ 181}** While it is unclear why trial counsel did not call Dr. Aronoff as a witness, trial counsel could have legitimately decided not to call Dr. Aronoff as a witness in order to avoid further discussion about Maxwell's possible malingering when taking the CAST*MR test. Moreover, Dr. McPherson discussed Dr. Aronoff's evaluations and findings that documented Maxwell's "borderline intellectual functioning * * * at the time based on the WASI, a shorter form of the Wechsler Adult Intelligence Scale." The decision to present Dr. McPherson's summary of Dr. Aronoff's findings instead of calling Dr. Aronoff as a witness was a matter of trial strategy and does not constitute ineffective assistance. *See State v. Keith*, 79 Ohio St.3d 514, 530, 684 N.E.2d 47 (1997) ("the presentation of mitigating evidence is a matter of trial strategy").

**{¶ 182}** In addition, the record shows that the decision not to call Dr. Aronoff as a witness did not result from a lack of investigation. Maxwell's lawyers knew that Dr. Aronoff existed and what his testimony would be. Because Maxwell's counsel knew what Dr. Aronoff had to say, counsel's decision not to call him as a witness during the penalty phase is " 'virtually unchallengeable.' " *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 158, quoting *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

**{¶ 183}** Maxwell cites the ABA guidelines, which state, "Counsel's duty to investigate and present mitigating evidence is now well established." *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.7, comment, 80 (Rev.Ed.2003). Maxwell argues that these guidelines required trial counsel to present Dr. Aronoff's testimony about Maxwell's low IQ scores. But the ABA guidelines are not "inexorable demands" with which all capital defense counsel must fully comply. *Van Hook*, 558 U.S. at 8, 130 S.Ct. 13, 175 L.Ed.2d 255. Moreover, "[a]ttorneys are not expected to present every potential mitigation theory, regardless of their relative strengths."

*Fears v. Bagley*, 462 Fed.Appx. 565, 576 (6th Cir.2012). Thus, trial counsel were not duty-bound to present Dr. Aronoff's testimony.

{¶ 184} Third, Maxwell argues that trial counsel were ineffective by failing to request instructions that would have allowed the jury to make an *Atkins* finding. But trial counsel were not ineffective by failing to request such instructions, because the jury does not decide whether a capital defendant is mentally retarded. *Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 187.

{¶ 185} Finally, Maxwell argues that trial counsel were ineffective by failing to make a penalty-phase closing argument that discussed his low intelligence as a mitigating factor. During the penalty-phase opening statements, trial counsel told jurors that the defense mitigation would consist of testimony from family members, friends, and coworkers about Maxwell's life, and testimony from Dr. McPherson about mitigating factors that she had found. During closing arguments, trial counsel did not make an argument about Maxwell's low intelligence. Rather, trial counsel argued residual doubt, a sole juror's ability to prevent the death penalty, Maxwell's alcohol abuse, testimony that Maxwell is a kind and good-hearted man, and the reality of a life sentence as a sentencing option.

{¶ 186} Trial counsel's argument appears to reflect a decision to downplay Maxwell's mental deficiencies as a mitigating factor while emphasizing other factors, such his family background and the realities of serving life in prison as punishment. Maxwell has failed to demonstrate that trial counsel's argument was professionally unreasonable. *See Bobby v. Bies*, 556 U.S. 825, 836, 129 S.Ct. 2145, 173 L.Ed.2d 1173 (2009), quoting *Atkins v. Virginia*, 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (" '[R]eliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury' ").

Moreover, Maxwell fails to show prejudice, as it cannot be said that there was a reasonable likelihood of a different outcome had defense counsel argued Maxwell's low intelligence as a mitigating factor.

### b. Failure to prepare for mitigation

{¶ 187} Maxwell argues that trial counsel were also ineffective because they were unprepared for the penalty-phase hearing.

{¶ 188} Maxwell argues that trial counsel showed that they were unprepared for mitigation by requesting a continuance on the first day of the penalty-phase proceedings. The jury returned its guilt-phase verdict on February 23, 2007, and the penalty-phase proceedings began on February 27, 2007. On the afternoon of February 27, trial counsel filed a motion requesting a continuance in the mitigation proceedings because they had not had adequate time to prepare a meaningful defense. Trial counsel's reasons for a continuance were Maxwell's mental illness, counsel's continued inability to properly communicate with Maxwell, and the prosecution's failure to provide the defense with records that the state wanted to be considered during mitigation. The prosecutor responded that there were no records that the state planned to present during its case-in-chief. The trial court denied the motion for a continuance.

{¶ 189} The presentation of mitigating evidence is a matter of trial strategy. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 74. Counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

{¶ 190} Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' " (Emphasis sic.) *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct.

2527, 156 L.Ed.2d 471 (2003), quoting *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, section 11.4.1(C), 93 (1989).

> This constitutionally required background investigation is necessary to enable counsel to make strategic choices about presenting a mitigation defense. * * * Indeed, the deference owed to counsel's strategic judgments about mitigation is directly proportional to the adequacy of the investigations supporting such judgments. Accordingly, when evaluating the reasonableness of counsel's mitigation strategy in a capital case, "a reviewing court must consider the reasonableness of the investigation said to support that strategy."

*Jells v. Mitchell*, 538 F.3d 478, 492 (6th Cir.2008), quoting *Wiggins*, 539 U.S. at 527.

{¶ 191} Trial counsel employed a criminal investigator, a clinical psychologist who was a mitigation specialist, and another psychologist who was a mitigation expert. The mitigation specialist interviewed Maxwell on several occasions beginning in May 2006. Dr. McPherson reviewed Maxwell's school records, prison records, and the records from his competency assessments. Thus, the defense had thoroughly prepared for the penalty phase.

{¶ 192} Nevertheless, Maxwell argues that the record shows that trial counsel were unprepared for the penalty phase. First, Maxwell argues that counsel failed to develop evidence that his mental illness prevented him from communicating with counsel during the penalty phase. However, the trial court ruled that Maxwell was "capable of understanding the nature and objectives of this proceeding and of assisting his counsel" after the competency hearing had

been conducted. Thus, counsel reasonably could have decided that any further development of this claim was unnecessary.

{¶ 193} Second, Maxwell argues that trial counsel were unprepared because they called only family members to testify that he was nonviolent, a good father, and a hard worker. Maxwell also questions trial counsel's effectiveness in calling these witnesses because their testimony opened the door to cross-examination about Maxwell's criminal record.

{¶ 194} Maxwell's initial claim is incorrect because Dr. McPherson provided expert testimony about Maxwell's background, his drug and alcohol problems, and his mental status. Testimony from family members and friends did reveal Maxwell's criminal past. But there were advantages as well as disadvantages in calling these witnesses. These witnesses helped to humanize him in front of the jury and showed that he had many positive characteristics as a good father and a hard worker.

{¶ 195} Moreover, trial counsel knew that Dr. McPherson was going to discuss Maxwell's criminal record during her testimony. Dr. McPherson testified that Maxwell's records from the Allen Correctional Institute showed that he was compliant with authority and had the skills to adjust to prison life. We hold that counsel's decision to call family members and friends was a reasonable trial strategy and did not violate *Strickland*. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 218.

{¶ 196} Third, Maxwell argues that trial counsel failed to develop evidence about his alcohol dependency. Dr. McPherson diagnosed Maxwell with alcohol abuse, probable dependency, currently in remission in a controlled setting. She testified that Maxwell has "a history that included blackouts, that included high use and tolerance" of alcohol that met "the criteria for an alcoholism or alcohol dependence diagnosis."

{¶ 197} Maxwell argues that trial counsel were deficient by failing to ask any of his family members about his drinking problems. Maxwell asserts that this omission undermined Dr. McPherson's diagnosis, since she acknowledged during cross-examination that her diagnosis of alcohol dependency was based on Maxwell's self-reporting. Maxwell also asserts that the lack of family testimony allowed the prosecutor to argue during closing argument that his drinking was not that serious, since "the people that see him every single day" said nothing about his alcoholism. But Maxwell's claims about family testimony are speculative because it is unknown what they would have said about his drinking problems. Thus, we reject this claim.

{¶ 198} Finally, Maxwell argues that the lack of a mitigation investigation was apparent because trial counsel indicated during the competency hearing that they had not seen his high school records. Trial counsel mentioned that they had not seen these records during the competency proceedings on February 6, 2007. Yet trial counsel had ample time to review these records prior to mitigation because the penalty-phase proceedings did not begin until February 27, 2007. We also reject this claim.

c. Failure to develop a coherent mitigation theme

{¶ 199} Maxwell argues that trial counsel were ineffective by failing to develop a coherent mitigation theme. Trial counsel's strategy was to convince the jury that Maxwell should receive a life sentence by emphasizing Maxwell's positive traits and demonstrating that he had low intelligence, suffered from alcohol dependency, had no significant history of violence, and would be a good prisoner. Trial counsel also raised residual doubt as a reason for a life sentence.

{¶ 200} In support of this strategy, trial counsel presented the testimony of Maxwell's family members and coworkers that Maxwell was kind-hearted, a good worker, and a family man. Dr. McPherson reviewed Maxwell's educational records and discussed test results that showed his low intelligence. She also

reviewed his prison records and explained how they showed that Maxwell would be a good prisoner if given a life sentence. Dr. McPherson also explained that Maxwell had suffered from alcohol dependency. The defense theory, although unsuccessful, was coherent and fit into the testimony. Counsel made a strategic decision in presenting the defense mitigation theory and were not ineffective. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 351-352.

### d. Arguing residual doubt

{¶ 201} Maxwell argues that trial counsel were deficient by improperly raising and arguing residual doubt as the only mitigating factor during the penalty-phase closing arguments. He cites *State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997). In *McGuire*, this court held that "[r]esidual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death."[2] *Id.* at syllabus.

{¶ 202} Trial counsel raised residual doubt as a reason not to impose the death penalty during closing arguments but also set forth other reasons for a life sentence. Trial counsel emphasized family testimony demonstrating Maxwell's positive traits, his lack of any significant history of violence, and his apology to Nichole's family. They also argued that the jury should consider that Maxwell suffered from alcoholism, headaches, and neurological problems. Thus, trial counsel did not rely exclusively on residual doubt in arguing that Maxwell should not be sentenced to death.

{¶ 203} Maxwell also does not explain how raising residual doubt during closing arguments was prejudicial. Thus, he has failed to demonstrate that trial counsel was ineffective by arguing residual doubt. We reject this argument.

---

2. Residual doubt of guilt has been defined as "a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.' " *Franklin v. Lynaugh*, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring).

e. Misidentification of Dr. McPherson's qualifications

{¶ 204} Maxwell argues that trial counsel improperly elicited from Dr. McPherson that she was a certified mitigation specialist. Maxwell asserts that certification as a mitigation specialist is a designation that does not exist.

{¶ 205} Dr. McPherson testified that she had been certified as a mitigation specialist. Trial counsel then tendered her as an expert witness in the area of mitigation. Without objection, the trial court allowed Dr. McPherson to testify as an expert.

{¶ 206} Maxwell misstates the court's ruling and erroneously claims that the trial court sustained the state's objection to Dr. McPherson's designation as a certified mitigation specialist and that this ruling undermined the credibility of the witness. In any event, there is little chance that any improper testimony about Dr. McPherson's certification as a mitigation specialist was prejudicial. Thus, we reject this ineffectiveness claim.

f. Failure to object to cross-examination of Dr. McPherson

{¶ 207} Maxwell argues that trial counsel failed to object to cross-examination of Dr. McPherson that "limited the jury's consideration of the evidence it could treat as mitigation."

{¶ 208} In *State v. DePew*, 38 Ohio St.3d 275, 288, 528 N.E.2d 542 (1988), the court stated that "it is the defendant who has the right to present and argue the mitigating factors. If he does not do so, no comment on any factors not raised by him is permissible."

{¶ 209} Dr. McPherson provided testimony about Maxwell's mental status, possible neurological problems, ability to adapt to prison life, and his history of alcohol abuse that the jury could consider as mitigating evidence. The prosecutor's cross-examination of Dr. McPherson addressed these issues. The prosecutor's questioning did not elicit objectionable information that limited the jury's consideration of the mitigating evidence.

{¶ 210} Moreover, the trial court instructed the jury, "You must consider all the mitigating factors presented to you. Mitigating factors include any factors that weigh in favor of a sentence other than death. This means that you are not limited to specific mitigating factors, you should consider any mitigating factors that weigh in favor of a sentence other than death." These instructions ensured that the jury understood its role in considering mitigation. Thus, trial counsel were not deficient by failing to object to such questioning.

{¶ 211} Maxwell also argues that trial counsel were deficient by failing to object to the prosecutor's reference to the R.C. 2929.04(B)(7) mitigating factor as the "catchall" factor. R.C. 2929.04(B)(7) permits a capital defendant to present "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." Maxwell claims that trial counsel should have objected to the word "catchall" because that designation implied that mitigation presented under (B)(7) did not merit the same consideration as evidence relating to the other statutory mitigating factors. But nothing shows that the jury gave less weight to (B)(7) evidence. Thus, we also reject this speculative claim.

g. Failure to object and preserve error

{¶ 212} Finally, Maxwell complains that trial counsel failed to object to the trial court's use of the term "recommendation" during voir dire, failed to properly request a neurologist to assist in mitigation, and failed to object to the prosecutor's penalty-phase argument. Maxwell raised counsel's failure to object to the trial court's use of the term "recommendation" in proposition IV. But this claim lacks merit because counsel did object. Maxwell's other two claims recast unsuccessful substantive propositions of law into ineffectiveness claims. But as discussed below in proposition XI, Maxwell was not prejudiced by counsel's failure to object to the prosecutor's penalty-phase argument. And as discussed next in proposition XII, trial counsel were not ineffective by failing to request a neurologist for mitigation purposes.

{¶ 213} Based on the foregoing, we overrule proposition I.

2. *Failure to appoint a neurologist* (Proposition of law XII)

{¶ 214} Maxwell argues that the trial court erred by failing to appoint a neurologist to develop mitigation. He also repeats claims that trial counsel were ineffective by failing to request a neurologist for mitigating purposes.

a. Facts

{¶ 215} On January 19, 2007, trial counsel filed a motion requesting funds to allow Dr. John Fabian to perform a neurological evaluation of Maxwell's mental condition. Trial counsel stated that in assessing Maxwell's medical history during the competency evaluation, "the Court Psychiatric Clinic and Northcoast indicated that Defendant was rendered unconscious for some time [due] to a motorcycle accident." Thus, trial counsel requested the court "to allow Dr. Fabian to continue to evaluate Defendant for Competency and Sanity and to allow him to conduct neurological testing and prepare reports outlining his findings and opinions."

{¶ 216} During the competency hearing on February 6, 2007, trial counsel clarified that they were not requesting Dr. Fabian to conduct the neurological evaluation of Maxwell, since Dr. Fabian was not a neurologist. Dr. Fabian was serving as a liaison with neurologists who perform this type of testing. Trial counsel then stated that they were requesting a neurological evaluation because Maxwell had told them that his life and the way he looks at things were different since that motorcycle accident. Thus, counsel requested a neurological evaluation to provide "objective medical findings in terms of an MRI or a CAT scan as per Dr. Fabian's recommendation."

{¶ 217} During the competency hearing, Dr. Cook testified that she had talked to Maxwell about the motorcycle accident, and he told her that he had received no treatment and had not been hospitalized as a result of the accident.

{¶ 218} Dr. Aronoff testified that he had reviewed Maxwell's medical records that showed he was treated at Meridia-Huron Hospital on March 29, 1999, after the motorcycle accident. Dr. Aronoff quoted findings from the medical records that reported that Maxwell was "sitting on motorcycle which was struck from behind by a car at low speed. He was thrown off the bike on to the right side. No loss of consciousness. Was wearing a helmet. Right shoulder, right hip, right elbow, right ankle are painful. No headache or neck pain." Dr. Aronoff also stated that x-rays were taken of Maxwell's shoulder, elbow, ankle, and hip, and they were all unremarkable.[3] However, Dr. Aronoff testified that Maxwell told him that he was rendered unconscious in the motorcycle accident.

{¶ 219} The trial court denied the defense request for a neurological evaluation. Trial counsel did not renew the request for a neurologist during the remainder of the trial.

b. Analysis

{¶ 220} As a matter of due process, an indigent defendant in a capital case is entitled to the basic tools with which to conduct an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In *Ake*, the United States Supreme Court concluded that the state must provide a psychiatric expert for the defense when the defendant has made a preliminary showing that his sanity will be a significant factor at trial. *Id.* at 74. Although *Ake* dealt only with a defendant's entitlement to psychiatric assistance, this court has recognized that due process may require the state to provide other types of expert assistance to a criminal defendant. *State v. Mason*, 82 Ohio St.3d 144, 149, 694 N.E.2d 932 (1998). Moreover, R.C. 2929.024 requires the trial court to provide expert assistance when "reasonably necessary for the proper representation of a defendant charged with aggravated murder."

---

3. Maxwell also supports his claim with Dr. McPherson's testimony. However, Dr. McPherson's testimony was not presented for consideration on this motion.

{¶ 221} In *Mason*, the court held that the state must provide an indigent criminal defendant with funds to obtain expert assistance when the defendant has made a particularized showing that (1) there exists a reasonable probability that the requested expert would aid the defense and (2) denial of that expert assistance would result in an unfair trial. The trial court's ruling on such requests is a matter left to the exercise of the court's "sound discretion." *Id*. at syllabus.

{¶ 222} Trial counsel did not request the appointment of a neurologist for purposes of mitigation. Rather, as the defense concedes, trial counsel requested a neurologist in the context of his competency evaluation. Thus, this claim lacks merit because the trial court never entertained a defense motion for a neurologist for mitigation purposes.

{¶ 223} Even assuming that the trial court should have construed the defense motion for a neurologist as carrying over for mitigation purposes, we hold that no error occurred. A defendant must show not just a mere possibility but a reasonable probability that an expert would aid in his defense. *State v. Broom*, 40 Ohio St.3d 277, 283, 533 N.E.2d 682 (1988).

{¶ 224} The defense request for a neurologist was based upon Dr. Fabian's recommendation and reports obtained during his competency evaluation stating that Maxwell was rendered unconscious following an earlier motorcycle accident. But Dr. Fabian did not testify, and any written reports from him were not submitted to the court.

{¶ 225} Maxwell's medical records showed that he suffered no loss of consciousness and reported no headache or neck pain as a result of that motorcycle accident. Thus, Maxwell's request merely raised the possibility that he had suffered a brain injury as a result of a motorcycle accident. It was not supported by anything in his medical records. Moreover, the medical records contradicted Maxwell's story about what happened after the accident. Maxwell

told Dr. Aronoff that he was rendered unconscious, and he told Dr. Cook that he received no medical treatment.

{¶ 226} Maxwell cites *State v. Eppinger*, 91 Ohio St.3d 158, 743 N.E.2d 881 (2001), in arguing that the defense was entitled to a neurologist. *Eppinger* addressed a defendant's right to an expert psychologist at a sexual-offender-classification hearing. *Eppinger* held that a defendant is entitled to such an expert if the trial court determines that the expert's services are reasonably necessary to aid in determining whether the offender is likely to engage in the future in one or more sexually oriented offenses. *Id.* at syllabus. *Eppinger* involved a totally different type of fact situation from the present case and does not support Maxwell's argument.

{¶ 227} Maxwell also cites *Frazier v. Huffman*, 343 F.3d 780 (6th Cir.2003), in arguing that the trial court erred in not appointing a neurologist. In *Huffman*, a capital case, the court held that defense counsel were ineffective by failing to investigate and present evidence of the defendant's brain impairment during the trial. *Id.* at 797. The court found that counsel were ineffective because after reviewing the defendant's medical records, they were aware that the defendant had suffered a brain injury from falling from a ladder, but they failed to investigate and present evidence about it. *Id.* at 794-795. Unlike the records in *Huffman*, Maxwell's medical records contain nothing that documents that he had suffered any brain injuries. Thus, *Huffman* is inapposite.

{¶ 228} Based on the foregoing, we hold that the trial court did not abuse its discretion in denying the defense request for a neurologist. *Compare Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, at ¶ 44-46 (no particularized need demonstrated for neuropharmacologist); *State v. Campbell*, 90 Ohio St.3d 320, 327-328, 738 N.E.2d 1178 (2000) ("mere possibility that the [specialized chest X-ray] could have had some [mitigation] value to the defense was not enough").

c. Ineffective assistance of counsel

**{¶ 229}** In proposition of law I, Maxwell asserted that trial counsel were ineffective by failing to request a neurologist to assist in the development of mitigation. Yet Maxwell provides no argument and cites no legal authority in support of this claim.

**{¶ 230}** Our review of this ineffectiveness claim starts with a review of Dr. McPherson's testimony to determine whether she provided counsel with additional information about Maxwell's head injuries from the motorcycle accident that required counsel to conduct a further investigation.

**{¶ 231}** Dr. McPherson administered the Bender-Gestalt test during her evaluation of Maxwell. She described the Bender-Gestalt as a "copying task" that serves as a low-level screening test. She testified that there was "some indication [that] his hand might not have been steady, but there were distortions that didn't make a lot of sense, so the question remained as to whether or not there was some kind of organically based anomaly, something that affects how his brain processes information."

**{¶ 232}** Dr. McPherson testified about past injuries that Maxwell reported suffering. Maxwell stated that he had been briefly unconscious after falling off a horse but that he did not receive any medical treatment for that incident. Dr. McPherson also discussed the motorcycle accident and said, "[H]e may have been briefly unconscious. He was certainly conscious when he was seen at the hospital for that one." Dr. McPherson also stated that there was nothing in Maxwell's medical records showing that he had suffered a traumatic head injury in the motorcycle accident.

**{¶ 233}** In discussing her final diagnosis, Dr. McPherson stated that Maxwell suffered from an adjustment disorder with depression and probable alcohol dependency. Dr. McPherson testified that she could not determine whether Maxwell had had a traumatic brain injury and advised that "whoever is

working with him next should continue to be aware that this may be there and try to come up with information to either rule it in or out." She also testified that Maxwell has "some type of cognitive difficulty. He may have some underlying organic problems and these may have rendered him more likely to react with irritability since that's one of the known things that can occur with certain kinds of organicity making him more prone to act out in a stressful situation such as a relationship that was flawed."

{¶ 234} Dr. McPherson's testimony about the need for further testing to rule out possible brain impairment appears to be based upon Maxwell's performance on the Bender-Gestalt test. She testified that the Bender-Gestalt test indicated some distortions, but she did not indicate that these results were conclusive as to brain damage. Thus, the Bender-Gestalt results raised only the possibility of brain impairment. *See State v. Allen*, 73 Ohio St.3d 626, 642, 653 N.E.2d 675 (1995) (trial court did not abuse discretion in refusing to appoint neurologist based on Bender-Gestalt test that showed little likelihood of brain damage).

{¶ 235} Maxwell fails to establish that counsel were deficient by failing to request a neurologist for mitigation purposes based on Dr. McPherson's testimony. First, the record does not show that trial counsel failed to investigate the need to request a neurologist after reviewing Dr. McPherson's findings. We cannot infer a defense failure to investigate from a silent record; the burden of demonstrating ineffective assistance is on Maxwell. *See Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, at ¶ 244.

{¶ 236} Second, the trial court could have properly denied a motion for a neurologist because Maxwell would have been unable to make a particularized showing of a reasonable probability that the requested expert would aid in his defense. *Mason*, 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus. Dr. McPherson reiterated that Maxwell's medical records did not show that he had suffered a

traumatic head injury during the motorcycle accident. Indeed, Dr. McPherson's information about a possible head injury resulted from Maxwell's self-reporting.

{¶ 237} Finally, Maxwell has failed to show that the absence of a neurological evaluation resulted in an unfair trial. *Id*. Dr. McPherson testified that there might be "some underlying organic problems and these *may have* rendered him more likely to react with irritability * * * in a stressful situation." (Emphasis added.) The evidence showed that Maxwell murdered Nichole in retaliation for her testimony. Accordingly, this was a planned murder rather than a sudden encounter involving a stressful situation. Thus, we reject this ineffectiveness claim.

{¶ 238} Based on the foregoing, proposition XII is overruled.

3. *Reintroduction of guilt-phase evidence* (Proposition of law XVI)

{¶ 239} Maxwell argues that the trial court erred by admitting guilt-phase evidence during the penalty phase that was irrelevant. The trial court, over defense objection, admitted photographs showing the victim displaying injuries she suffered during the felonious assault, a photograph of the victim without injuries, and an autopsy photograph of the victim's face.

{¶ 240} R.C. 2929.03(D)(1) provides that at the penalty stage of a capital proceeding, the court and jury shall consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing * * * [and] hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." *DePew*, 38 Ohio St.3d at 282-283, 528 N.E.2d 542. The trial court did not abuse its discretion in readmitting photographs displaying injuries that Nichole suffered during the felonious assault or the autopsy photograph, because these items bore some relevance to the nature and circumstances surrounding the R.C. 2929.04(A)(8) specification. The photograph

of Nichole without injuries was of questionable relevance, but no prejudice resulted from its introduction.

**{¶ 241}** Based on the foregoing, proposition XVI is overruled.

4. *Prosecutorial misconduct during closing arguments* (Proposition of law XI)

**{¶ 242}** Maxwell argues that the prosecutor committed various instances of prosecutorial misconduct during his closing arguments. However, except where noted, trial counsel failed to object to the prosecutor's argument and thus waived all but plain error. *State v. Williams*, 51 Ohio St.2d 112, 364 N.E.2d 1364 (1977), paragraph one of the syllabus.

**{¶ 243}** Whether a prosecutor's remarks constitute misconduct depends upon (1) whether the remarks were improper and, if so, (2) whether the remarks prejudicially affected an accused's substantial rights. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

**{¶ 244}** First, Maxwell argues that, over defense objection, the prosecutor commented, "I know it's devastating for the families, especially Nichole's family and what they've gone through." The mention of "the personal situation of the victim's family, without more, does not constitute misconduct." *State v. Goodwin*, 84 Ohio St.3d 331, 339, 703 N.E.2d 1251 (1999). The prosecutor's comments about the victim's family were brief and did not dwell on the pain they suffered. Thus, we hold that no misconduct occurred. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 140.

**{¶ 245}** Second, Maxwell argues that the prosecutor improperly argued that his ability to adapt to prison life was not a mitigating factor. During arguments, the prosecutor stated:

70

You must engage in that weighing process and * * * with that aggravating circumstance, the retaliation think what have you heard in this case that mitigates against that * * *. What mitigating factors have you heard? He's capable of conforming to prison life? That's a mitigating factor? Is that—really? You assign the weight that you think each of these deserve.

**{¶ 246}** "Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight." *State v. Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996). The prosecutor was not arguing that Maxwell's ability to adapt to prison was not a mitigating factor. Rather, the prosecutor was responding to Dr. McPherson's testimony that Maxwell could conform his conduct to the highly structured setting of a prison. He was arguing that such evidence was not entitled to significant weight. Nothing in this argument resulted in plain error.

**{¶ 247}** Finally, Maxwell contends that the prosecutor misbehaved by arguing the absence of mitigating factors the defense never raised. The prosecutor argued:

You've had good people come up here and tell you about Mr. Maxwell, try to mitigate against this aggravating circumstance. We didn't hear bad childhood, abusive situations, * * * wanting for anything in life. We just didn't hear it. We heard he had support. We heard he was raised correctly. He went to church. You know and the Judge—the doctor said no mental defect or disease. Did you hear any remorse? I mean I don't—those are the things that you have to consider, folks.

{¶ 248} "A prosecutor can respond to issues raised by an accused." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 101. The prosecutor was responding to extensive testimony presented by Maxwell's friends and family members, stating that Maxwell was kind-hearted, a good man, and a family man. Ernestine Brewer, Maxwell's mother, testified that he was "a great kid" and was raised in the church. The prosecutor's comments about remorse responded to Maxwell's unsworn statement: "I would like to say that I'm sorry to the victim's family and my family for going through this. I wouldn't want nobody's family to go through this." The prosecutor's comments about defense testimony and Maxwell's unsworn statement represented fair comment and did not constitute plain error.

{¶ 249} Based on the foregoing, proposition XI is rejected.

### C. Remaining issues

1. *Appropriateness of death sentence* (Proposition of law XVIII)

{¶ 250} Maxwell argues that the death penalty is not appropriate because of the compelling mitigating evidence presented in his behalf. We will address these arguments during our independent sentence evaluation.

2. *Cumulative error* (Proposition of law XVII)

{¶ 251} Maxwell claims that the cumulative effect of errors committed during trial deprived him of a fair trial and necessitates reversal of his conviction and death sentence.

{¶ 252} We have recognized the doctrine of cumulative error. *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal. *Id.* at 196-197.

**{¶ 253}** The doctrine of cumulative error is not applicable in the present case. Maxwell received a fair trial, and there are not numerous instances of trial-court error. Moreover, Maxwell was not prejudiced by any error at the trial or penalty phase of the proceedings.

3. *Settled issues* (Proposition of law XIX)

**{¶ 254}** Maxwell challenges the constitutionality of Ohio's death-penalty statutes under both the United States Constitution and the Ohio Constitution. We reject these claims on the basis of *State v. Carter*, 89 Ohio St.3d 593, 607, 734 N.E.2d 345 (2000); *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987), paragraph one of the syllabus; *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph one of the syllabus.

**{¶ 255}** Maxwell also challenges the constitutionality of Ohio's reasonable-doubt standard. However, this court has affirmed the constitutionality of R.C. 2901.05(D). *Jones*, 91 Ohio St.3d at 347, 744 N.E.2d 1163; *see also State v. Goff*, 82 Ohio St.3d 123, 132, 694 N.E.2d 916 (1998).

### IV. Independent Sentence Evaluation

**{¶ 256}** Having considered Maxwell's propositions of law, this court must independently review Maxwell's death sentence for appropriateness and proportionality and independently determine whether the aggravating circumstance of which Maxwell was convicted outweighs the mitigating factors pursuant to R.C. 2929.05(A). The R.C. 2929.04(A)(3) murder-to-escape-accountability specification was merged with the R.C. 2929.04(A)(8) retaliation specification before sentencing.

### A. Aggravating circumstance

**{¶ 257}** The evidence at trial established beyond a reasonable doubt that Maxwell murdered Nichole McCorkle in retaliation for her testimony in a criminal proceeding, R.C. 2929.04(A)(8). Accordingly, we consider whether the aggravating circumstance of which Maxwell was convicted, R.C. 2929.04(A)(8),

murder in retaliation for testimony in another criminal proceeding, outweighs the evidence presented in mitigation.

*B. Mitigating evidence presented*

{¶ 258} Maxwell called ten mitigating witnesses and made an unsworn statement. William Steward, Maxwell's oldest brother, testified that Maxwell comes from a good family. Maxwell has four brothers and three sisters. Steward stated that Maxwell has a good heart and will give the shirt off his back to help people. Maxwell graduated from high school and later obtained vocational training and learned how to operate heavy machinery. Steward also stated: "[Maxwell] is not a monster or anything. * * * [T]he picture that's being painted here is I think a little bit different than what really lurks here." Finally, Steward stated, "I personally would like to say to the victims that I apologize and I'm sorry about * * * what the family is going through and this whole incident."

{¶ 259} Herbert Nelson, grew up with Maxwell, a first cousin, and Maxwell's family would visit Nelson, who lived in Arkansas. Nelson later moved to the Cleveland area, and he and Maxwell worked jobs together. Nelson testified that Maxwell was a "real good worker" and a "real good guy." Nelson stated that he missed Maxwell and asked the court to have mercy on him.

{¶ 260} Veronica Nelson, Herbert's wife, had known Maxwell since she became engaged to marry her husband five years earlier. Veronica testified that she has always felt comfortable around Maxwell. She stated that he was "always well-dressed, well-behaved, not drunken, not cursing, [and] mannerable." Maxwell was also "loving towards his family, his mother, his sisters, at all times."

{¶ 261} Roscoe Horne, a neighbor, testified that he had known Maxwell since 2002 or 2003 and that Maxwell had performed construction work for Horne's construction company. Horne stated that Maxwell operated heavy equipment and was an excellent worker and very trustworthy. Horne also described him as a good neighbor who was friendly and went out of his way to

help other people. Horne testified that Maxwell often took food to older people during the holidays. Horne concluded by saying, "[A] lot of people love him and our hearts go out to him."

{¶ 262} Bernard McNear, Maxwell's brother-in-law, had known Maxwell for five or six years. McNear testified that Maxwell offered him the opportunity to work on construction jobs and helped teach him the work. McNear stated that Maxwell was an outgoing person and was always willing to talk with McNear and give him positive advice.

{¶ 263} Theresa McNear, Maxwell's younger sister, testified that Maxwell was a nice guy. Theresa spent a lot of time tagging along with Maxwell when they were growing up. They went fishing together, and Maxwell tried to teach her how to ride a horse. Maxwell provided Theresa with help in dealing with stressful issues and helped Theresa's daughter with her homework. Theresa also testified that Maxwell loved his daughter, C.M., and had a good interaction with her. Theresa concluded that Maxwell had a huge heart, loved hard, and would help anybody.

{¶ 264} Sharon Graves, Maxwell's older sister, testified that he was a playful child and was always there if his brothers and sisters needed him. Graves stated that Maxwell had a loving relationship with C.M. Graves also stated that Maxwell had been supportive of her children and went to her daughter's high school graduation. Graves emphasized that Maxwell was a "good person."

{¶ 265} Andy Maxwell, the defendant's younger brother, had always wanted to follow his big brother. When Andy was eight years old, Maxwell saved Andy from drowning. Andy testified that Maxwell had "been like that" all through life. He stated that Maxwell had a great relationship with C.M. and took her horseback riding and did other activities with her. Maxwell had also been very helpful with other people. For example, Maxwell distributed a list of information about felons needing jobs to possible employers.

{¶ 266} Ernestine Brewer, Maxwell's mother, testified that Maxwell was born in Arkansas but spent most of his life in Ohio. Brewer testified that Maxwell was raised in the church and was a "Bible-taught kid." Brewer said that Maxwell spent time in prison but was always by her side after his release. Brewer said that Maxwell was a "good kid." In conclusion, she told the jury, "He might have fell by the wayside and I'm asking them to please spare his life * * *. People do things out of anger, you know, so that's it."

{¶ 267} Dr. Sandra McPherson evaluated and conducted psychological testing of Maxwell. Dr. McPherson evaluated Maxwell's educational records from the Cleveland public schools, his records from Allen Correctional Institute, where he spent five years, and his competency assessments.

{¶ 268} Dr. McPherson testified that Maxwell did not do particularly well in school. His grades "tended to be * * * D's and F's; there were some C's." Dr. McPherson stated that Maxwell's criminal records show charges and convictions for drug trafficking and that there was also "a domestic violence associated with the victim of this crime." Maxwell's prison records show that he was "compliant with authority." Dr. McPherson stated that "there was a report rendered to the parole board saying that his conduct had been basically exemplary and that he would be appropriate for release."

{¶ 269} Maxwell also received a series of assessments during his competency evaluation that found him to be competent. Dr. McPherson testified that there were symptoms of possible mental illness, but there were also questions as to whether he was exaggerating them. Dr. McPherson also testified that there was a confirmed diagnosis of alcohol dependence, and other diagnoses included "a differential between paranoid personality disorder and paranoid psychosis which was unresolved as well as borderline intellectual functioning." A history of head trauma was also noted in these evaluations.

{¶ 270} Dr. McPherson testified that Maxwell's reading ability is at the eighth-grade level. Results from the Wechsler Adult Intelligence Scale showed that Maxwell has a full-scale IQ of 84, a performance IQ of 95, and a verbal IQ of 77. She testified that results from the Bender-Gestalt test showed some distortions that might reflect "some kind of organically based anomaly, something that affects how his brain processes information." She stated that Maxwell reported two head injuries. One injury occurred when he fell off a horse, and the other resulted from a motorcycle accident. Maxwell reported that he had periodic headaches that have continued through the years, and these interfere with his functioning when they occur.

{¶ 271} Results of the Thematic Apperception Test were relatively limited. Dr. McPherson testified that there were indications in Maxwell's stories of depression and a desire to avoid what was unpleasant. Results on the Minnesota Multiphasic Personality Inventory-2 showed that his validity scales were within range, and the clinical scales were within normal limits. Dr. McPherson testified that there was "no sign of any psychosis or condition that would have rendered him incapable of understanding what's going on in the world around him."

{¶ 272} Dr. McPherson diagnosed Maxwell with an adjustment disorder with depression and alcohol abuse, probable dependency, currently in remission in a controlled setting. Dr. McPherson's diagnosis included "Rule out traumatic brain injury with residual systems." Dr. McPherson testified that this means "I can't call it but whoever is working with him next should continue to be aware that this may be there and try to come up with information to either rule it in or out."

{¶ 273} Dr. McPherson discussed mitigating factors that she found from her tests and interviews. She stated that Maxwell is capable of conforming his conduct in a highly structured setting and has the skills to adjust to prison and not

be a problem. Dr. McPherson stated that Maxwell has some cognitive difficulty. He may have some underlying organic problems, and these may have rendered him more likely to react with irritability in a stressful situation such as a flawed relationship. She also testified that Maxwell has no record of violence other than the current situation. In addition, Maxwell has indicated his desire to be a positive person, and he has done things for his family.

{¶ 274} Finally, Dr. McPherson stated that Maxwell maintains his innocence of the crime and continues to do so.

{¶ 275} Maxwell made an unsworn statement during mitigation:

First of all, I would like to say that I'm sorry to the victim's family and my family for going through this. I wouldn't want nobody's family to go through this.

And I have one child and I did this to see her this one last time. And my family haven't saw her, I haven't saw her and my father is always in Arkansas and he comes to see her every two years probably and that's the only grandchild he has and I want her to be a part of his life.

{¶ 276} The next segment of Maxwell's unsworn statement was addressed to his daughter, C.M.:

I love her and I miss her. And I miss her mother too. And I want her to be a part of my family's life. The little time that I have with her.

{¶ 277} The final segment of Maxwell's unsworn statement was addressed to Nichole's family:

I want to say that I'm sorry that they had to go through this. And I would ask them if they would let [C.M.] be a part of my family, my family's life. She love them and they love her.

{¶ 278} Before final sentencing, Maxwell made a statement in allocution for the trial court's consideration:

I want to say I'm sorry for the tragedy and what I meant to say was I want to be able to see my daughter grow up and my family—she be a part of my family because they're going to keep her away from my family and I want to be able to live and see her grow up. * * * I would like to be able to live and see her grow into a person. Thank you.

{¶ 279} The statutory mitigating factors under R.C. 2929.04(B) include (B)(1) (inducement of murder by victim), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (not being the principal offender), and (B)(7) (any other relevant factors). The first six factors do not apply, but several points in mitigation arise under the (B)(7) factor. We give appropriate weight to Maxwell's low-average intelligence (IQ of 84). His diagnosed alcohol abuse is also entitled to some weight. *See Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, at ¶ 146.

{¶ 280} Some weight should be given to the love and support that Maxwell shares with his family. *See State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 178. We also give some weight to testimony that

Maxwell is a good and dependable worker. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

{¶ 281} Maxwell argues that this court should consider testimony that he will be able to adjust well to prison life. *See State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000). Dr. McPherson testified that Maxwell's prison records showed that his conduct had been exemplary in prison. We give some weight in mitigation to Maxwell's ability to adjust to prison life.

{¶ 282} Maxwell also argues that his remorse is entitled to weight as a mitigating factor. In his unsworn statement, Maxwell apologized to his family and the victim's family "for going through this." During allocution, Maxwell told the trial court, "I'm sorry for the tragedy." Yet Dr. McPherson testified that Maxwell maintains his innocence of the charges. Thus, Maxwell continues to deny responsibility for Nichole's murder. Maxwell's denials negate the mitigating weight that we might otherwise give to his expressions of sorrow. *See Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, at ¶ 205.

{¶ 283} Finally, Maxwell raises residual doubt as a mitigating factor. Maxwell argues that his reason for shooting Nichole was jealousy rather than retaliation for her testimony against him. He argues that this is at best a mixed-motive case and makes the aggravating circumstance of retaliation less serious. Yet the evidence established that Maxwell murdered Nichole because she testified against him before the grand jury. Moreover, residual doubt is not a reason to overturn a death sentence. *See McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus. Thus, we reject residual doubt as a mitigating factor in this case. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 284} There is nothing mitigating in the nature and circumstances of the offenses. Moreover, Maxwell's history and background provide little mitigating value. He was raised by a loving mother and was surrounded by a supportive family and friends.

{¶ 285} We weigh the aggravating circumstance of R.C. 2929.04(A)(8), the witness-murder specification, against these mitigating factors. Here, Maxwell murdered Nichole McCorkle in retaliation for testifying against him before the grand jury. Maxwell's mitigating evidence is weak in comparison. Maxwell has also refused to accept responsibility for murdering Nichole. We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

{¶ 286} Finally, the death sentence is both appropriate and proportionate. *See Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, at ¶ 235 (murder in retaliation for testimony); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 212 (murder to prevent testimony in an upcoming murder trial); *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101 (murder in retaliation for filing domestic-violence charges).

## V. Conclusion

{¶ 287} We affirm the judgment of conviction and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL and KENNEDY, JJ., concur.

FRENCH, J., concurs separately.

PFEIFER and O'NEILL, JJ., concur in part and dissent in part.

_____

**FRENCH, J., concurring.**

{¶ 288} I agree with the concurring and dissenting opinion that the admission of the autopsy report and the admission of Dr. Felo's testimony regarding the information contained in the autopsy report violated Maxwell's confrontation rights, but that the admission of that evidence constituted harmless error. I also agree that Dr. Felo's independent conclusions would not offend the Confrontation Clause.

{¶ 289} Autopsy reports are not per se nontestimonial. Ohio's statutory scheme makes clear that an autopsy is intended to serve *two* distinct purposes: (1) investigation of homicides and other crimes and (2) investigation of public-health concerns. R.C. 313.131(C)(1) ("An autopsy is a compelling public necessity if it is necessary to the conduct of an investigation by law enforcement officials of a homicide or suspected homicide, or any other criminal investigation, or is necessary to establish the cause of the deceased person's death for the purpose of protecting against an immediate and substantial threat to the public health"). To determine which purpose takes precedence in any given case, we must look to the facts of that particular case. Here, police responded to a shooting. The coroner received the body of a victim who had been shot twice in the head. Common sense tells us that the coroner was not investigating a mysterious public-health epidemic. He was investigating a homicide and would have clearly expected his report to be used in a subsequent murder trial. Thus, in this case, the report was testimonial.

{¶ 290} I agree with the majority's independent review of the imposition of the death penalty, however, and would affirm on those grounds.

---

**PFEIFER, J., concurring in part and dissenting in part.**

{¶ 291} I dissent from the imposition of the death penalty in this case. I would find under our independent sentence evaluation that the imposition of death is not appropriate for this defendant.

{¶ 292} I concur in the majority's judgment affirming the defendant's convictions, but disagree with the statements the majority makes regarding the admissibility of autopsy reports prepared by nontestifying medical examiners and regarding the admissibility of the testimony of surrogate medical examiners who rely upon the autopsy reports of nontestifying medical examiners. Ultimately, I concur in that part of the majority's judgment that affirms the conviction because

I believe that although both the admission of Dr. David Dolinak's autopsy report into evidence and Dr. Joseph Felo's testimony regarding Dr. Dolinak's autopsy report violated defendant-appellant Charles Maxwell's Sixth Amendment right to confrontation, the trial court's errors were harmless beyond a reasonable doubt.

I

{¶ 293} In its landmark Confrontation Clause case, *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause bars "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." But the court left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* To some extent, we still await that clarifying day, especially in the area of autopsy reports; several state court decisions regarding the admissibility of autopsy testimony have been appealed to the United States Supreme Court, but to this point, the court has not granted certiorari on the issue. *State v. Navarette*, 2013-NMSC-003, 294 P.3d 435, *cert. denied,* ___ U.S. ___, 134 S.Ct. 64, 187 L.Ed.2d 254 (2013); *State v. Joseph*, 230 Ariz. 296, 283 P.3d 27 (2012), *cert. denied*, 133 S.Ct. 936, 184 L.Ed.2d 733 (2013); *State v. Mitchell*, 2010-ME-73, 4 A.3d 478, *cert. denied*, 133 S. Ct. 55, 183 L.Ed.2d 709 (2012). The nation, like this court, remains split on the question. But since *Crawford*, the court in cases like *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), and *Williams v. Illinois*, ___ U.S. ___, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), has provided enough guidance to establish that in most criminal cases, autopsy evidence is testimonial and implicates a defendant's Sixth Amendment confrontation right.

A

Admission of the Autopsy Report

*Melendez-Diaz*

{¶ 294} I write today as the author of *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621. In *Craig*, this court held that an autopsy report prepared by a nontestifying medical examiner created no confrontation-right implications because it was a business record; the court in *Crawford* had indicated that business records are, "by their nature," not testimonial. *Crawford*. at 56. This court wrote:

> An autopsy report, prepared by a medical examiner and documenting objective findings, is the "quintessential business record." *Rollins v. State* (2005), 161 Md.App. 34, 81, 866 A.2d 926. "The essence of the business record hearsay exception contemplated in *Crawford* is that such records or statements are not testimonial in nature because they are prepared in the ordinary course of regularly conducted business and are 'by their nature' not prepared for litigation." *People v. Durio* (2005), 7 Misc.3d 729, 734, 794 N.Y.S.2d 863.

*Craig*, ¶ 82.

{¶ 295} However, the reasoning that an autopsy report is admissible as a nontestimonial business record was undone by *Melendez-Diaz*. The court held that the business-and-official-records hearsay exception does not permit an otherwise inadmissible testimonial statement to be admitted into evidence. *Melendez-Diaz*. at 324. The court pointed out that although documents kept in the regular course of business are ordinarily admitted into evidence under the hearsay exception, they will not be admitted "if the regularly conducted business activity

is the production of evidence for use at trial." *Id.* at 321. The records may have had other purposes unrelated to their later use at trial, but if they were " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' " they are considered testimonial. *Id.* at 311, quoting *Crawford* at 52.

{¶ 296} The question of whether an objective witness who prepared an autopsy report would believe that that statement would be available for later use at trial is a difficult hurdle for the state to overcome in a case like this one, where the medical examiner autopsied a victim who was shot twice in the head. Any objective medical examiner would reasonably believe that an autopsy report that reflected the examination of a shooting victim would be available for use at a later trial. In the autopsy report admitted into evidence in this case, the cause of death on the front page of the report is listed as "Gunshot wounds of head. HOMICIDE." Could a medical examiner who makes that conclusion believe anything other than that the report will be available for use at a later trial? He could not. But this court has distorted the applicable test.

*"Primary Purpose" Test*

{¶ 297} Every autopsy report is not, by definition, testimonial. At least one court has held that if a coroner did not contemplate at the time of the autopsy that criminal conduct had occurred, then the autopsy report is nontestimonial. *United States v. James*, 712 F.3d 79 (2d Cir.2013). The court in *James*, like the majority, employed a "primary purpose" test in evaluating the autopsy reports. Before *James*, the Second Circuit had held that "autopsy reports could be admitted as business records without violating the Confrontation Clause." *Id.* at 87. Recognizing that recent precedents like "*Melendez-Diaz* and *Bullcoming*, and to a lesser extent *Williams*, call this categorical conclusion into doubt," *id.* at 94, the court concluded that "a statement triggers the protections of the Confrontation

Clause when it is made with the primary purpose of creating a record for use at a later criminal trial," *id*. at 95-96.

{¶ 298} Applying that test, the court held that testimony regarding a nontestifying coroner's autopsy report in a case where foul play had not been suspected at the time of the autopsy did not implicate the Confrontation Clause. In *James*, multiple victims had died from poisoning. Dr. Corinne Ambrosi testified about an autopsy that was conducted on one victim, Basdeo Somaipersaud, by Dr. Heda Jindrak, who did not testify. The court concentrated on the fact that murder was not suspected by the medical examiner who prepared the report:

> The defendants do not argue * * * that Somaipersaud's autopsy was anything other than routine—there is no suggestion that Jindrak or anyone else involved in this autopsy process suspected that Somaipersaud had been murdered and that the medical examiner's report would be used at a criminal trial. * * * The autopsy report itself refers to the cause of death as "undetermined" and attributes it both to "acute mixed intoxication with alcohol and chlorpromazine" combined with "hypertensive and arteriosclerotic cardiovascular disease."
>
> The autopsy was completed * * * substantially before any criminal investigation into Somaipersaud's death had begun. During the course of Ambrosi's lengthy trial testimony, neither the government nor defense counsel elicited any information suggesting that law enforcement was ever notified that Somaipersaud's death was suspicious, or that any medical examiner expected a criminal investigation to result from it.

Indeed, there is reason to believe that none is pursued in the case of most autopsies.

*Id*. at 98-99. Because of the nontestifying medical examiner's lack of expectation of criminal involvement, the court concluded that "the autopsy report was not testimonial because it was not prepared primarily to create a record for use at criminal trial." *Id*. at 99. The court concluded similarly about another victim's toxicology report—there was no testimony that a criminal investigation was contemplated during the inquiry into the cause of death. *Id*. at 101.

{¶ 299} The majority applies the primary-purpose test in a very different way from the court in *James*. The majority does not conclude that the autopsy here was not part of a criminal investigation; it could not reasonably do so. Instead, it states the categorical conclusion that autopsy reports in Ohio in general "are created 'for the primary purpose of documenting cause of death for public records and public health.' " Majority opinion at ¶ 57. That is, autopsy records are created so that we can have records. That makes no more sense than holding that the primary purpose behind the medical examiner's autopsy report was that his boss told him to do it, or so that he could get paid for the week.

{¶ 300} The majority does not explore *why* the state requires coroners to document causes of death in cases involving suspected violence. A coroner in Ohio is statutorily interconnected with Ohio's criminal-justice apparatus. Pursuant to R.C. 313.12(A),

[w]hen any person dies as a result of criminal or other violent means * * * the physician called in attendance, or any member of an ambulance service, emergency squad, or law enforcement agency who obtains knowledge thereof arising from the person's duties, shall immediately notify the office of the coroner of the

known facts concerning the time, place, manner, and circumstances of the death * * *.

**{¶ 301}** Pursuant to R.C. 313.15, the coroner works with the prosecuting attorney and other law-enforcement officials to determine how long a dead body should remain in the coroner's control; a coroner must keep possession of the body until he has decided that he no longer requires the body to determine the cause of death or until he has decided that law-enforcement officials no longer need the body to assist them with their duties

**{¶ 302}** Under R.C. 313.09, "[t]he coroner shall promptly deliver, to the prosecuting attorney of the county in which such death occurred, copies of all necessary records relating to every death in which, in the judgment of the coroner or prosecuting attorney, further investigation is advisable."

**{¶ 303}** Pursuant to R.C. 313.10(A), autopsy records "shall be received as evidence in any criminal or civil action or proceeding in a court in this state, as to the facts contained in those records."

**{¶ 304}** The coroner relies on law enforcement to provide information about suspicious deaths, consults with law enforcement on the preservation of evidence, and informs prosecuting attorneys when further investigation is advisable. It is not enough for the coroner to stamp "Homicide" on an autopsy report and file it neatly away. The coroner's verdict establishes the starting point for a homicide investigation and eventual prosecution by determining a primary fact: a person has died by unnatural causes, not by his own hand.

**{¶ 305}** It is before that statutory backdrop that Dr. Dolinak received the victim's body. She had suffered two bullet wounds to the head. Curtiss Jones of the Cuyahoga Coroner's Office Trace Evidence and DNA Department testified that after the body was received and prior to the autopsy, evidence was collected to perform tests for gunpowder and trace metals and to evaluate blood and

fingernail scrapings taken from the victim. Certainly, a reasonable medical examiner in Dr. Dolinak's position would have had to know that this case had criminal implications.

{¶ 306} In a case in which a coroner attests that the cause of death is homicide, the medical examiner knows at the time he or she attests to that statement that that report will be available for later use at trial. The level of detail involved with the autopsy process demonstrates that the primary purpose of an autopsy in a criminal case is potential prosecution. If only the fact of her death was relevant, why was trace evidence collected from the victim's body before the autopsy? In *James*, the circuit court looked, as this court should, at the expectations of the coroner conducting the autopsy at the time—did the medical examiner anticipate that the case was a criminal one?

{¶ 307} Under the majority's holding, a court would never look to the expectations of a reasonable medical examiner to determine primary purpose. The state has done his thinking for him—he may think he's helping to solve a crime, but this court says that he is only trying to keep meticulous records. Under the majority opinion, no medical examiner ever creates an autopsy report for the primary purpose of creating a record to be used at trial. Instead, I would hold that whether a particular autopsy report is testimonial should be determined on a case-by-case basis.

{¶ 308} The majority decision is based entirely on the word "primary," stating that "[f]or Sixth Amendment purposes, it is only the *primary* purpose of a document that determines whether it is testimonial or not." (Emphasis sic.) Majority opinion at ¶ 62. I do not agree that the word "primary" deserves the artificial elevation that the majority gives it. It is not a part of the majority tests for expert-witness testimony in *Melendez-Diaz* or *Bullcoming*; "primary purpose" is not the common thread in the Supreme Court's jurisprudence on testimonial statements. *James*, 712 F.3d at 108 (Eaton, J., concurring). The primary-purpose

test applies to police-interrogation cases like *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which statements made to police by witnesses are evaluated by the declarant's reason for making the statement. In *Davis*, which concerned whether statements made in a 9-1-1 call to police were testimonial, the court held:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822.

{¶ 309} I would hold that although the primary-purpose doctrine may apply to a lay witness who is in extremis at the time the statement is made, it does not apply to professionals regularly involved in creating statements used at trial. Instead, I favor the definition of "testimonial statement" as enunciated in Judge Eaton's concurrence in *James*: "[A] testimonial statement is one having an evidentiary purpose, declared in a solemn manner, and made under circumstances that would lead a reasonable declarant to understand that it would be available for use prosecutorially." *James*, 712 F.3d at 108 (Eaton, J., concurring).

{¶ 310} Under that test, too, the autopsy report in this case would be considered testimonial.

*Williams*

{¶ 311} A consideration of the court's separate opinions in *Williams* establishes that another possible justification for finding autopsy reports to be nontestimonial, that the autopsy report does not target a certain suspect, has been foreclosed. The court set forth the factual scenario at issue:

> In petitioner's bench trial for rape, the prosecution called an expert who testified that a DNA profile produced by an outside laboratory, Cellmark, matched a profile produced by the state police lab using a sample of petitioner's blood. On direct examination, the expert testified that Cellmark was an accredited laboratory and that Cellmark provided the police with a DNA profile. The expert also explained the notations on documents admitted as business records, stating that, according to the records, vaginal swabs taken from the victim were sent to and received back from Cellmark. The expert made no other statement that was offered for the purpose of identifying the sample of biological material used in deriving the profile or for the purpose of establishing how Cellmark handled or tested the sample. Nor did the expert vouch for the accuracy of the profile that Cellmark produced.

*Williams*, ___ U.S. ___, 132 S.Ct. at 2227, 183 L.Ed.2d 89.

{¶ 312} The lead opinion in *Williams*, which totaled just four supporters, offered two reasons why the expert's statements were not testimonial. First, the out-of-court statements from the Cellmark report were related by the testifying expert solely for the purpose of explaining the assumptions on which the expert's opinion relied—that the Cellmark result matched the state's result—and were not

offered for their truth. *Id*. at 2240-2241. That issue is discussed below in this opinion's analysis of the surrogate-testimony issue. Second, and more relevant to the issue of the admissibility of the autopsy report itself, the lead opinion concluded that even if the Cellmark report had been introduced for its truth, there would be no Confrontation Clause violation, because the statements did not involve "out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Id*. at 2242. The lead opinion explained:

> Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time.

*Id.* at 2243.

{¶ 313} In my dissent in *State v. Crager*, 116 Ohio St.3d 369, 2007-Ohio-6840, 879 N.E.2d 745, a case involving the admission of a DNA test result performed by a nontestifying analyst, I attempted to distinguish the admissible autopsy report in *Craig* from a DNA test that I argued should not be admissible:

> The Confrontation Clause "applies to 'witnesses' *against the accused*." (Emphasis added.) *Crawford*, 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. A coroner is concerned with how the decedent died rather than who may have killed him. Thus, the coroner is not a "witness" against a specific person when he or she prepares a report from an autopsy. A coroner's report is not done at

the behest of the prosecution in preparation for litigation; it is done pursuant to statute. See R.C. 313.131(B).

*Crager*, ¶ 107 (Pfeifer, J., dissenting).

{¶ 314} But one thing that emerged from the fractured court in *Williams* is that a majority of the court rejected the notion that test results are testimonial only if the testing targets a known suspect. Justice Thomas, who disagreed with both of the lead opinion's rationales, but concurred in judgment, stated:

> The new primary purpose test [from the *Williams* plurality opinion] asks whether an out-of-court statement has "the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Ante*, at 2242. That test lacks any grounding in constitutional text, in history, or in logic.

*Williams*, 132 S.Ct. at 2262, 183 L.Ed.2d 89 (Thomas, J., concurring in the judgment).

{¶ 315} Writing for the four justices in dissent, Justice Kagan stated:

> [T]he plurality states that the Cellmark report was "not prepared for the primary purpose of accusing a targeted individual." *Ante*, at 2248. Where that test comes from is anyone's guess. Justice Thomas rightly shows that it derives neither from the text nor from the history of the Confrontation Clause. * * * And it has no basis in our precedents. We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—in other words, for the purpose of providing evidence. *Davis,* 547 U.S. at 822, 126

S.Ct. 2266, 165 L.Ed.2d 224. None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual.

*Id.* at 2273–2274 (Kagan, J., dissenting).

{¶ 316} The concurrence and dissent establish that a majority of the court rejects the idea that a diagnostic test is not testimonial if it does not target a specific individual.

B

Testimony by a Substitute Medical Examiner

{¶ 317} The majority makes the unremarkable statement that "the majority of jurisdictions that have examined this issue have concluded that a substitute examiner, on direct examination, may at least testify as to his or her own expert opinions regarding the autopsy and the victim's death." Majority opinion, ¶ 50. However, the testifying examiner is greatly restricted from revealing to the jury information from the autopsy report of the nontestifying preparer of the report. The testifying medical examiner in this case improperly introduced testimonial statements contained in the autopsy report prepared by the nontestifying medical examiner; he became a surrogate for the presentation of testimonial statements.

*Bullcoming*

{¶ 318} In *Bullcoming*, ___ U.S. ___, 131 S.Ct. at 2713, 180 L.Ed.2d 610, the court held that a scientific report could not be used as substantive evidence against the defendant unless the analyst who prepared and certified the report was subject to confrontation. "As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id.* at 2713. The test in question was a blood-alcohol test involving a defendant charged with driving while intoxicated.

The state attempted to enter the test results into evidence through the testimony of another analyst; the analyst who performed the test was unavailable because he was on unpaid leave for an undisclosed reason. The court rejected the surrogate testimony.

{¶ 319} The holding applies not just to the original analyst's conclusions and opinions, but also to factual observations he or she may have generated:

> Most witnesses, after all, testify to their observations of factual conditions or events, *e.g.*, "the light was green," "the hour was noon." Such witnesses may record, on the spot, what they observed. Suppose a police report recorded an objective fact— Bullcoming's counsel posited the address above the front door of a house or the read-out of a radar gun. * * * Could an officer other than the one who saw the number on the house or gun present the information in court—so long as that officer was equipped to testify about any technology the observing officer deployed and the police department's standard operating procedures? As our precedent makes plain, the answer is emphatically "No."

*Bullcoming* at 2715.

{¶ 320} Therefore, as the court held in *Commonwealth v. Phim*, 462 Mass. 470, 479, 969 N.E.2d 663 (2012), a substitute medical examiner cannot testify as to statements of fact contained in an autopsy report:

> Consistent with the Sixth Amendment and traditional protections against hearsay * * * a substitute medical examiner may not testify on direct examination to the facts, data, and conclusions stated in an autopsy report. * * * Accordingly, the

prosecutor should not have elicited testimony on the description of the fatal wound contained in the nontestifying medical examiner's files, or of the victim's weight, height, and general physical condition.

*Williams*

{¶ 321} Nor can factual statements contained in an autopsy report be admitted into evidence as forming the basis of the substitute medical examiner's expert testimony. *Navarette*, 2013-NMSC-03, 294 P.3d 435, ¶ 13 and 19. The court in *Navarette* derived that conclusion from *Williams*, based upon the rejection by five members of the court in *Williams* of the lead opinion's assertion that an "an out-of-court statement that supports an expert witness's opinion is not offered to prove the truth of the matter asserted, but is only offered as the basis for the expert's opinion." *Navarette* at ¶ 13. Justice Thomas's concurrence and the dissent of Justice Kagan together establish that conclusion. Justice Thomas wrote that "statements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth." *Williams*, 132 S.Ct. at 2257, 183 L.Ed.2d 89 (Thomas, J., concurring in the judgment). Justice Kagan wrote for the four dissenters:

[W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion,* * * the statement's utility is then dependent on its truth. If the statement is true, then the conclusion based on it is probably true; if not, not. So to determine the validity of the witness's conclusion, the factfinder must assess the truth of the out-of-court statement on which it relies. That is

why the principal modern treatise on evidence variously calls the idea that such "basis evidence" comes in not for its truth, but only to help the factfinder evaluate an expert's opinion "very weak," "factually implausible," "nonsense," and "sheer fiction." D. Kaye, D. Bernstein, & J. Mnookin, The New Wigmore: Expert Evidence § 4.10.1, pp. 196-197 (2d ed.2011); *id.*, § 4.11.6, at 24 (Supp.2012).

*Id.* at 2268–2269 (Kagan, J., dissenting).

*Dr. Felo's Testimony*

**{¶ 322}** In this case, at trial, Dr. Felo was encouraged by the state to review the autopsy report on the witness stand and to reveal the report's findings to the jury. For instance, from the autopsy report, he related:

And on the external surface of her body were some—three identifying tattoos, some evidence of medical therapy, and two specific injuries of the head. Each of those injuries were gunshot wounds with one injury, one gunshot wound within the right eyebrow, and the second gunshot wound through the left ear and into the skull near the ear on the left.

He also testified as to the internal examination conducted by Dr. Dolinak:

Specifically there was a broken portion of the skull where the right forehead and eye socket is, there was a tear going through the right eyeball, and then in the brain there was some evidence of some bleeding and bruising caused by the bullets going into the skull and striking the brain.

{¶ 323} The state also inquired regarding whether Dr. Dolinak had performed any microscopic evaluation of the body, and Dr. Felo responded, "Samples were examined underneath the microscope of the brain which documented the tears and bleeding of the brain caused by bullets going through the brain."

{¶ 324} I would conclude that the admission of the information contained in the autopsy report prepared by Dr. Dolinak through Dr. Felo's testimony violated Maxwell's confrontation rights. The Sixth Amendment does not countenance surrogate testimony, nor does it allow the admission of testimonial statements prepared by nontestifying experts to serve as the basis of a testifying expert witness's testimony.

{¶ 325} Just because the Confrontation Clause would not allow Dr. Felo to testify regarding Dr. Dolinak's work does not mean that the Confrontation Clause would prohibit Dr. Felo's testimony altogether. I agree with the court in *Navarette* that a substitute medical examiner could testify regarding certain materials within an autopsy file:

> This is not to say that all material contained within an autopsy file is testimonial and therefore inadmissible. Without attempting to catalogue all material in a file that could be admissible, we note that an expert witness may express an independent opinion regarding his or her interpretation of raw data without offending the Confrontation Clause. * * * For example, in this case, after being shown the autopsy photographs, [the substitute medical examiner] expressed his own opinion about the entry and exit wounds, explaining the basis for his opinion. He did not simply parrot the opinion or subjective statement of the

pathologist who performed the autopsy and took the photographs. Thus, he was available for cross-examination.

*Navarette*, 2013-NMSC-003, 294 P.3d 435, ¶ 22. In this case, too, Dr. Felo testified about his own conclusions regarding McCorkle's wounds while viewing autopsy photographs. To that extent, his testimony was proper under the Confrontation Clause.

## C

### Other Jurisdictions

**{¶ 326}** On the federal level, the Eleventh and D.C. Circuits, in *United States v. Ignasiak*, 667 F.3d 1217, 1231 (11th Cir.2012), and *United States v. Moore*, 651 F.3d 30, 72-73 (D.C.Cir.2011), have held that forensic pathology reports are testimonial for Confrontation Clause purposes.

**{¶ 327}** Further, at least eight state courts of last resort also find that autopsy reports are testimonial. *State v. Locklear*, 363 N.C. 438, 452, 681 S.E.2d 293 (2009); *Navarette*; *State v. Kennedy*, 229 W.Va. 756, 735 S.E.2d 905 (2012); *Commonwealth v. Reavis*, 465 Mass. 875, 992 N.E.2d 304 (2013); *People v. Childs*, 491 Mich. 906, 810 N.W.2d 563 (2012); *Cuesta-Rodriguez v. State*, 2010-OK CR 23, 241 P.3d 214 (2010), *cert. denied* 132 S.Ct. 259, 181 L.Ed.2d 151 (2011); *Wood v. State*, 299 S.W.3d 200, 209-210, 214-215 (Tex.Crim.App.2009); *State v. Lui*, 179 Wash.2d 457, 315 P.3d 493 (2014).

## II

### Other Concerns

**{¶ 328}** The varied jurisprudence on the issue of the testimony of substitute medical examiners demonstrates that it is a recurring issue that demands resolution. Medical examiners die, they retire, and they move between jurisdictions. The nontestifying medical examiner who performed the autopsy in this case, Dr. Dolinak, is perhaps the poster child for the issue. In *Wood*, 299

S.W.3d 200, the tables were turned: Dr. Dolinak, since moved to Texas, testified instead of the medical examiner who conducted the autopsy. The Texas Court of Appeals held that Dr. Dolinak improperly revealed contents of the nontestifying medical examiner's autopsy report in his testimony: "Under the circumstances of this case, the disclosure of the out-of-court testimonial statements underlying Dr. Dolinak's opinions, even if only for the ostensible purpose of explaining and supporting those opinions, constituted the use of the testimonial statements to prove the truth of the matters stated in violation of the Confrontation Clause." *Id.* at 213.

{¶ 329} Although the United States Supreme Court has not dealt squarely with the issue, in the corners and footnotes of *Melendez-Diaz*, the majority and dissenters frame the practical concerns about the admissibility or inadmissibility of autopsy reports. Writing for the four dissenters in *Melendez-Diaz*, Justice Kennedy mentions the autopsy report as the drum major in a parade of horribles created by the majority decision:

> [T]he range of other scientific tests that may be affected by the Court's new confrontation right is staggering. See, *e.g*., Comment, Toward a Definition of "Testimonial": How Autopsy Reports Do Not Embody the Qualities of a Testimonial Statement, 96 Cal. L. Rev. 1093, 1094, 1115 (2008) (noting that every court post-*Crawford* has held that autopsy reports are not testimonial, and warning that a contrary rule would "effectively functio[n] as a statute of limitations for murder").

*Melendez-Diaz*, 557 U.S. at 335, 129 S.Ct. 2527, 2546, 174 L.Ed.2d 314.

{¶ 330} Justice Scalia, writing for the majority, addresses the dissenters' claim that confrontation is not the only way to challenge forensic testing:

"Respondent and the dissent may be right that there are other ways—and in some cases better ways—to challenge or verify the results of a forensic test." *Id.* at 318. But the majority adds in a footnote, "Though surely not always. Some forensic analyses, such as autopsies and breathalyzer tests, cannot be repeated, and the specimens used for other analyses have often been lost or degraded." *Id.* at fn. 5.

{¶ 331} These excerpts from *Melendez-Diaz* frame the concerns about autopsy reports. On the one hand, there is the concern that autopsy reports can last only as long as a preparer survives or stays within the jurisdiction. On the other hand, if the person who performed the autopsy is not available to testify, a defendant is powerless to rebut the findings of the one medical examiner who, in most cases, is the only person who will ever perform an autopsy on the victim in question.

{¶ 332} In my mind, the "statute of limitations on murder" belies the argument for autopsy reports being nontestimonial. If having no autopsy report available makes a murder conviction impossible, elevating an autopsy to a central role in a murder trial, does that not make it all the more imperative that a defendant have an opportunity to call into doubt the veracity of the report through cross-examination?

{¶ 333} In reality, in most cases, like this one, the autopsy report will not affect the trial in a meaningful way. But there are other cases in which autopsy testimony will be crucial. There are innumerable conclusions that a coroner could make in an autopsy report—cause of death, time of death, whether certain injuries are antemortem or postmortem, the presence of defensive wounds, evidence of rape, whether a baby was shaken—that can implicate or exonerate a defendant. Further, the determinations made in an autopsy are not mechanical. "Autopsies are also much more complex than the identification of a narcotic, and are more prone to shades of gray, as their outcome is a diagnosis, not a chemical compound match." Tsiatis, *Putting Melendez-Diaz on Ice: How Autopsy Reports Can*

*Survive the Supreme Court's Confrontation Clause Jurisprudence*, 85 St. John's L.Rev. 355, 383 (2011).

{¶ 334} "Medical examiners are not mere scriveners" and "autopsy reports are the product of the skill, methodology, and judgment of the highly trained examiners who actually performed the autopsy." *United States v. Ignasiak*, 667 F.3d 1217, 1232 (11th Cir.2012). It is the diagnostic, subjective nature of autopsy reports that makes them especially appropriate for cross-examination:

> The crux of the confrontation issue—the need to confront and cross-examine the attending forensic pathologist—is that forensic pathologists are physicians. Physicians exercise judgment and make mistakes, whether they treat living, breathing patients or perform forensic autopsies. Courts that have adopted the view that forensic autopsy reports simply memorialize objective data are misinformed. Neither forensic pathologists nor forensic autopsy reports are fungible. Forensic pathologists would not necessarily report the same findings if each were, hypothetically, able to perform the same autopsy.

Ginsberg, *The Confrontation Clause and Forensic Autopsy Reports—A "Testimonial,"* 74 La.L.Rev. 117, 168 (2013).

{¶ 335} The cross-examination of a surrogate is thus inadequate for a defendant:

> The only vehicle by which a criminal defendant may explore the subjectivity involved in the performance of the forensic autopsy—to question the judgment of the examining forensic pathologist—is cross-examination. The in-court testimony of the

surrogate forensic pathologist who examines the autopsy report prepared by the examining pathologist is an inadequate substitute. The surrogate witness is not the physician who was required to be familiar with the facts and the autopsy protocol, examine the victim's body, perform the autopsy procedure, make and report findings, and report the cause and manner of death. The cross-examination of the surrogate yields very little. The surrogate can rely on the autopsy findings with impunity. There is simply little to be gained by the defendant in the effort to cross-examine the surrogate. Cross-examination is the great truth-seeking test, but it is an empty exercise when the surrogate testifies at trial.

*Id.* at 170.

{¶ 336} The point made by the court in *Melendez-Diaz* rings especially true with regard to autopsy reports: "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." *Melendez-Diaz,* 557 U.S. at 319, 129 S.Ct. 2527, 174 L.Ed.2d 314. If other forensic tests implicate a defendant's confrontation right, certainly an autopsy report should:

> Both *Bullcoming* and *Melendez–Diaz* hold that a laboratory analyst's report of sufficient solemnity triggers the protections of the Confrontation Clause. It would be incongruous indeed, if an autopsy report requiring numerous skilled judgments on the part of a medical examiner, did not require the same confrontation.

*James*, 712 F.3d at 111 (Eaton, J., concurring).

{¶ 337} The central question in the most serious of crimes is whether the victim involved suffered an unnatural death at the hands of another. The idea that

a person who makes that determination is not subject to cross-examination is at direct odds with the Confrontation Clause.

### III

**{¶ 338}** Ultimately, I agree with the majority that the admission of Dr. Dolinak's autopsy report into evidence and Dr. Felo's testimony regarding it constituted harmless error beyond a reasonable doubt. I therefore concur in the judgment of the majority as to Maxwell's guilt. I dissent from the imposition of the sentence of death.

O'NEILL, J., concurs in the foregoing opinion.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Saleh S. Awadallah, Matthew E. Meyer, Thorin O. Freeman, Brian M. McDonough, and Adam M. Chaloupka, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and John P. Parker, for appellant.

_____